THIRD DIVISION
December 31, 2008

No. 1-07-2335

| | | |
|---|---|---|
| ANTHONY GRILLO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| YEAGER CONSTRUCTION, | ) | |
| | ) | |
| Defendant-Appellant | ) | |
| | ) | |
| | ) | Honorables |
| (Rubina Shakir and Solhail Shakir, a/k/a Sam Shakir, | ) | William J. Haddad, |
| | ) | Jeffrey Lawrence, |
| | ) | Judges Presiding. |
| Defendants-Appellees). | ) | |

JUSTICE QUINN delivered the opinion of the court:

Plaintiff, Anthony Grillo suffered injuries when he fell from scaffolding while performing masonry work on the construction of a new house for Sohail (a/k/a Sam) and Rubina Shakir in Northbrook, Illinois. Plaintiff filed a complaint at law against the Shakirs and defendant, Yeager Construction, alleging common-law negligence. In his complaint, plaintiff alleged that defendant was the general contractor of the construction site and that David Yeager was an employee or agent of defendant. Prior to trial, the circuit court granted summary judgment in favor of the

1-07-2335

Shakirs and also dismissed defendant's contribution counterclaim against the Shakirs. Following a trial, the jury returned a verdict in favor of plaintiff and assessed plaintiff's damages at $1,834,496. On appeal, defendant contends that: (1) the circuit court erred in denying its motion for judgment notwithstanding the verdict (judgment *n.o.v.)* where plaintiff failed to establish a *prima facie* case of negligence; (2) defendant is entitled to a new trial due to various errors committed by the circuit court; and (3) the circuit court erred in entering summary judgment for the Shakirs on defendant's contribution counterclaim against them. For the following reasons, we affirm.

## I. Background

At trial, plaintiff testified that he had over 30 years of masonry experience. Plaintiff testified that he first learned of the Shakir residential construction project in August 2001, when he received a telephone call from David Yeager at Yeager Construction. Plaintiff testified that he met with David at the construction site in Northbrook, Illinois, to negotiate a price for masonry work. Plaintiff met with David on his first and second visits to the construction site, and they orally agreed to a contract price during plaintiff's third visit to the site. Plaintiff testified that he asked David, "Who is going to pay me?" and "[W]ho is guaranteeing the money?" Plaintiff testified that David replied, "[N]ot me. Yeager Construction." Plaintiff testified that he saw vehicles with the Yeager Construction logo at the construction site. Plaintiff testified that to get paid, he submitted his invoices to David, but he received checks from the Shakirs.

Plaintiff testified that his work at the construction site included building chimneys and all of the brick around the outside of the house. David informed plaintiff that the house was to be

-2-

completed before Christmas and plaintiff testified that he was going to be able to complete his work on time if the general contractor made sure he was paid and made sure all of the backfill on the site was done before plaintiff performed his outside masonry work. Plaintiff explained that backfilling entailed placing dirt back around the foundation, nearly level with the ground, after the foundation was built. Plaintiff testified that backfilling is important for the building of scaffolding and the safety of masons and everyone else at the construction site. Plaintiff testified that he started with two employees on the construction site, which increased to seven employees in order to complete the work by winter. Plaintiff also testified that his employees built the scaffold and he supervised them.

Plaintiff testified that he spoke with David about open holes and trenches on the construction site and asked David to backfill from "day one" and every day thereafter for two months. Toward the end of October 2001, plaintiff and his employees finished all of the ground-level brick work and needed to use a scaffold to work up higher on the house. Plaintiff was laying bricks and supervised his employees as they built the scaffold. Plaintiff testified that he owned or rented the scaffolding and no one, including David, told him how to erect the scaffold. Plaintiff testified that sometimes he would be told to stop what he was doing and to start working on something else. Plaintiff testified that he observed the ground conditions at the time the scaffold was erected. Plaintiff observed that the back two legs of the scaffold were placed on cinder blocks due to the open holes at the construction site. Plaintiff testified that he is familiar with Occupational Safety and Health Administration (OSHA) regulations and that setting up a scaffold on cinder blocks violated OSHA regulations and construction industry custom and practice.

Plaintiff testified that after the scaffold was erected, the job was stopped for a week. Plaintiff testified that he would not be allowed on the site during that time and decided to address the scaffold issue when he returned.

On October 29, 2001, plaintiff returned to the construction site and told his employees that he did not like the way the scaffold was erected because the scaffold was partially on cinder blocks and the scaffold was not complete without guardrails. Plaintiff testified that David was having a meeting in front of the house, and plaintiff made a "smart remark" to him by "thanking" him for the backfilling that had not been done. Plaintiff testified that he made the sarcastic comment because he had been asking David to backfill the house since the start of the job, but had been "ignored over and over and over and over." Plaintiff testified that David responded by calling him a "whiner" and walked away to his meeting. Plaintiff testified that he intended to speak with David again about the backfilling after David's meeting.

Plaintiff testified that he was under pressure to complete his work, so he decided to climb the scaffold to take window measurements in order to proceed with his next phase of work. Plaintiff testified that he climbed the scaffold, about 12 feet off the ground, with just a tape measure on his belt. Plaintiff testified that the scaffold suddenly tipped upside town and he fell into an open hole, landing next to an exposed pipe inside of the hole. Plaintiff testified that after his fall, he saw that the scaffold was at an angle and no longer supported by the cinder blocks.

Plaintiff testified that he was taken by ambulance to the hospital, where he had back surgery and stayed for approximately three weeks. Plaintiff testified that after a year of rehabilitation, he was able to walk on his own. Plaintiff also testified that he continues to have

tremendous pain and suffers from personality changes and nausea from the narcotic pain relievers he must take.

Dr. Jerry Bauer testified that he is a board-certified physician specializing in neurosurgery. Dr. Bauer treated plaintiff in the emergency room on October 31, 2001, and shortly thereafter performed surgery to relieve pressure on plaintiff's spinal cord. Dr. Bauer testified that plaintiff's surgery left him with permanent metal screws and plates in his lower spine, and permanent disability. Dr. Bauer testified that over time, plaintiff will likely develop additional degenerative changes above and below the fused area in his spine. Dr. Bauer testified that he observed that plaintiff had recovered from his initial spinal cord injury. Dr. Bauer also testified that plaintiff was being treated with narcotics, which would preclude him from working. Dr. Victoria Santucci testified via an evidence deposition, over defendant's objection that the subjects of her testimony had not been disclosed before her evidence deposition was taken. Dr. Santucci testified that she is employed by Advanced Pain Centers, which focuses on pain management. Dr. Santucci first examined plaintiff for back pain on March 11, 2004. Based on her examination, Dr. Santucci attributed plaintiff's pain to his fall from the scaffolding and concluded that his injury is permanent.

Scott Yeager testified that he is the owner and president of Yeager Construction. Scott testified that Yeager Construction was not the general contractor on the construction site. Scott testified that Yeager Construction did not enter into a subcontract with plaintiff to perform work at the construction site and Yeager Construction did not pay plaintiff for the work that he performed. Scott testified that in 2001, his brother David was not an employee or on the payroll

of Yeager Construction. Scott testified that Yeager Construction prepared various invoices on Yeager Construction letterhead, which indicated it was general contractor, for David because David did not have a computer. Scott testified that he assisted the Shakirs in obtaining a bank loan to fund their house construction by signing a form saying Yeager Construction was the general contractor, but maintained that all of the money went to the Shakirs rather than Yeager Construction. Scott testified that he only visited the construction site twice, but David kept him apprised of the progress on the construction site.

Scott also testified about the role of a general contractor. Scott admitted that a general contractor has both the ability and responsibility to correct safety hazards at the construction site. Scott testified that a mason would not do backfilling, which is performed with a backhoe that is not part of a mason's equipment. Scott testified that backfilling is important because it is unsafe for workers to work on unlevel ground or around safety hazards such as open trenches or holes in the ground. Scott testified that he did not think that a backhoe was brought to the construction site by Yeager Construction. Scott testified that even if another subcontractor performed the backfilling, it is still the general contractor's duty to make sure that the backhoe is used so that there are no safety hazards at the jobsite. Scott acknowledged that it is the responsibility of the general contractor to routinely inspect the construction site. Scott testified that if a representative of a general contractor allows work to continue on a jobsite where scaffold is improperly supported, that general contractor is negligent.

Scott also identified several documents relevant to this case. First, Scott identified plaintiff's exhibit 10, a document entitled "Firstar Home Mortgage Builder Approval Checklist,"

which identified Yeager Construction as the builder.

Second, Scott identified plaintiff's exhibit 12, as a schedule and outline that he created for the building of the Shakirs' residence. The schedule and outline listed "Yeager Construction project management costs," which included that David, as superintendent, would receive $5,000 a month for project management and job supervision; an additional $2,000 a month for mobile phone costs, traveling fuel, administrative costs, and temporary housing; and a note that David would sell his full-sized truck and purchase a mini-truck to decrease fuel costs. The schedule and outline also included tasks that Scott testified were tasks done by a general manager, such as acquiring subcontractor bids, procuring contracts for subcontractors, scheduling and organizing subcontractors and quality control on the project. Scott agreed that the document showed that "David was acting as the superintendent and the representative of Yeager Construction."

Third, Scott identified three invoices, plaintiff's exhibits 13, 14, and 15, for work done on the Shakirs' residence by David. These invoices bear the Yeager Construction logo with the words "general contractors."

Fourth, Scott identified a document entitled "Notes from Scott and Engineer," plaintiff's exhibit 19, which was a document that he created in his own handwriting. In this document, Scott made a number of design suggestions to the Shakirs, such as raising the roof line and resizing a steel beam, and gave advice on structural and cost considerations. Scott testified that he personally went through all of those things and made the recommendations in the document.

Fifth, Scott identified plaintiff's exhibit 29, as a letter to the Shakirs' architect, Pete Holsman, that Scott wrote and signed on Yeager Construction letterhead. Scott's letter conveyed

1-07-2335

the Shakirs' desired design changes directly to the architect, without any involvement by David.

Sixth, Scott identified documents entitled "Residential Construction Loan Procedures," plaintiff's exhibits 7, 8, 9, and 11. Scott testified that he signed these documents to secure a construction loan for the Shakirs' residence. Scott acknowledged that he signed the bank documents on October 5, 2001, approximately three weeks prior to plaintiff's injury, and wrote "contractor" next to his name. Scott testified that although he signed the document as the general contractor for the bank, he was not the general contractor. Scott also testified that when he signed the document, he wanted the bank to rely on his representation that he was the general contractor and the bank thought that he was the contractor.

Seventh, Scott identified a document entitled "Certificate of Insurance," plaintiff's exhibit 16. In this document, Yeager Construction is named as the insured on the Shakir construction project.

Finally, Scott identified a document entitled "AIA-101," plaintiff's exhibits 21 through 26, which is a standard form agreement between an owner and contractor, issued by the American Institute of Architects. Scott testified that he created the AIA-101 contract used in this case by copying an AIA form that he purchased at a bookstore and adding his company's information. The contract, which Scott signed, identified Yeager Construction as the contractor and David as the "[c]ontractor's representative." The contract also states that "AIA Document 201, General Conditions of the Contract for Construction," is adopted by reference. Scott testified that he was not familiar with AIA-201 reflecting industry standards dealing with safety.

The AIA-101 contract between defendant and the Shakirs included several provisions

related to control over the work and safety at the construction sire. Article 3 of the contract provided, *inter alia*, that the "Contractor shall be responsible to determine the procedures of construction, and to provide safe and adequate scaffolding, ladders, stages, hoists, temporary supports and other facilities or methods as he may determine are required for safety and for the execution and completion of the Work." Article 3 also provided that the "Contractor shall supervise and direct the Work, using the Contractor['s] best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract." Article 10 provided that the "Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract." Article 10 also stated that the "Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and Architect."

David Yeager testified that Scott introduced him to the Shakirs, who needed to have a house built. David testified that Rubina Shakir was the general contractor for the Shakirs' house construction project. David testified that he was hired by the Shakirs through an oral agreement to act as a consultant for their house construction project. David testified that the Shakirs paid him a monthly salary plus expenses, such as a hotel room, gas and mileage, and phone bills. In return, David assisted the Shakirs in hiring plumbers, heating, ventilating and air conditioning (HVAC) contractors, roofers, carpenters, foundation contractors and excavators. David also

filled in the blanks on applications for building permits for the Shakirs.

David testified that Yeager Construction did not control the work activities at the construction site. David testified that he reported to the Shakirs and was paid by the Shakirs. David admitted that at the time of the trial he was an employee of Yeager Construction, but testified that he never told plaintiff that he worked for Yeager Construction. David testified that plaintiff met with him and the Shakirs and the Shakirs made the final decision to hire plaintiff.

David testified that he did not erect or supervise the erection of plaintiff's scaffold. David testified that plaintiff never asked him to backfill, because "[i]t was already backfilled." David also denied calling plaintiff a "whiner." David testified that he was not present when plaintiff fell off the scaffold, because he was having a meeting inside the house with the Shakirs. David testified that he is not trained in erecting scaffolding or safety, and is not familiar with OSHA regulations.

David also testified that he oversaw the subcontractors and their work when he was at the construction site. David used a truck with the name "Yeager Construction" on it. David testified that Scott paid for his cellular phone bill and David used Scott's credit card to pay for expenses before being reimbursed by the Shakirs. David printed invoices to the Shakirs for his services and expenses on Yeager Construction letterhead. David also testified that he told suppliers that he was from Yeager Construction and expected them to rely on that so that the suppliers would give the Shakirs a lower price.

Sam Shakir testified that he owned four gas stations in Indiana that were built by Yeager Construction. Sam testified that Scott Yeager and his brothers ran Yeager Construction, which

was also the general contractor that he used to build his house in Northbrook, Illinois. Sam testified that during the planning stages, Scott and David visited his house several times. Sam testified that Scott told him that David worked for Yeager Construction and David would supervise the construction project.

Sam testified that Scott arranged for the construction project to be insured through an agency in Indiana, where Scott lived and Yeager Construction was located. Scott also told Sam that he would obtain the necessary building permits for the construction project and David took care of the whole process because the Shakirs "didn't have a clue." Sam testified that David advised Rubina to list her name on Village of Northbrook documents as the general contractor because Yeager Construction did not have an Illinois license. Sam testified that Rubina has no experience running construction sites, including no experience with masonry, plumbing, excavation or concrete. Sam testified that Rubina was not the general contractor on the construction site and only signed the Village of Northbrook documents because Scott and David told her to do so. Sam explained that Rubina and he signed documents as directed by Yeager Construction because there was "a big friendship between us and Yeager Construction. We trusted them."

Sam testified that Yeager Construction was the general contractor at the construction site. Sam testified that the bank released the loan money directly to Yeager Construction, which used the money to pay for doors, lumber, and other expenses then gave remaining funds to the Shakirs. David picked up checks from the bank, then overnighted them to Scott. David paid some of the subcontractors through Scott, and the Shakirs paid some of them with checks from their personal

checkbook. The Shakirs paid whatever David told them to pay, using money from the bank loan. Sam testified that he trusted that Scott would keep track of all of the money and believed that Scott kept some of the money from the loan for his services as a general contractor, because that was part of their agreement.

Sam testified that plaintiff or plaintiff's construction company, Grillo Construction, was hired by Yeager Construction, as were all of the other subcontractors at the construction site. Sam testified that Scott visited the construction site every month, which amounted to at least 12 times during the length of the construction project. Sam stated that he worked at his gas stations in Indiana Monday through Friday and was at the site only on weekends. Sam also called Scott weekly for updates and Scott would obtain information from David, who was at the construction site Monday through Friday. Sam testified that David was hired to supervise and routinely inspect the construction site. Sam testified that after plaintiff's fall, David rented a bulldozer and personally used it to backfill and level holes on the construction site. David left the project shortly after plaintiff's injury occurred. The construction site was closed for a week, then Mark Yeager, another of the Yeager brothers, was sent to finish the project. Mark Yeager did finish the project for Yeager Construction.

Wayne Hanson testified that he was the director of development for the Village of Northbrook. Hanson testified that Northbrook has a program whereby a homeowner could serve as a general contractor. Hanson testified that Northbrook created a form for residents who are going to build their own homes that served to alert such residents "if they proceeded and did something illegally that they would have to remove it and correct the violation." Hanson testified

that Northbrook's involvement with construction projects relates to making sure residents comply with Northbrook's building codes and the purpose of having owners and general contractors in Northbrook's program is to provide notice that if they do something wrong, Northbrook will tell them they have to tear it down. Hanson testified that Northbrook's safety provisions are limited to "safety of the folks in the neighborhood, the adjacent property owners" and Northbrook does not get involved in compliance with OSHA or industry standards on the construction site.

Hanson testified that Rubina signed an agreement with the Village of Northbrook in which Rubina requested to be her own contractor and acknowledged that she was "ultimately responsible as the permit holder for the performance of all subcontractors on the job site and compliance with the plans and specifications on *** file with the [V]illage." Hanson testified that the Village considered Rubina to be her own general contractor. Hanson testified that neither Yeager Construction nor David Yeager is identified as the general contractor on the building permits for the Shakirs' house. Hanson testified that Yeager Construction is listed as the cement contractor on one of the permit applications for the Shakirs' house. Hanson also recalled that Sam told him during preconstruction that Sam would be using a contractor from Indiana, named Yeager Construction.

Dennis Puchalski testified, as plaintiff's construction safety expert, that he reviewed photos of the Shakirs house construction site which were taken by the architect, as well as numerous depositions and documents in this case. Puchalski testified that the use of cinder blocks to support a scaffold is prohibited by the safety standards of OSHA, the American National Standards Institute (ANSI), the Associated General Contractors of America Society and the

National Association of Homebuilders. Puchalski's opinion was that the cinder blocks moved, causing the scaffold to tip and plaintiff to fall from the scaffold. Puchalski's opinion was based on plaintiff's testimony, combined with reviewing the photographs and the ground conditions in this case. Puchalski testified that he did not think that the scaffold slipped off the concrete window sill because, if that had occurred, the scaffold would have gone entirely down.

Peter Holsman testified that he was the Shakirs' project architect, who was hired by the Shakirs to create the design plans for their new house. Holsman testified that, to the best of his knowledge, David was working as a "freelance" assistant to Sam and was not working for Yeager Construction.

Michael Mooney testified that he is a vocational rehabilitation counselor who works with individuals who have suffered an injury. Mooney testified that he becomes familiar with an individual's medical situation, work history, educational background and training and attempts to look at transferrable skills that the individual can use in a new occupation. Mooney testified that he was retained by defense counsel to offer opinions concerning vocational rehabilitation options for plaintiff that are less strenuous than masonry. Mooney testified that plaintiff most likely could no longer be a bricklayer. Mooney testified that he reviewed plaintiff's records, but never met plaintiff. Mooney testified that he was aware that plaintiff had run a masonry company since the 1980s. Mooney testified that he was provided with documents relating to the state registration of plaintiff's company's name.

At the close of evidence, the circuit court denied defendant's request to submit a special interrogatory to the jury addressing the question of whether plaintiff was an independent

contractor. The jury returned a verdict in favor of plaintiff and assessed damages against defendant in the amount of $2,866,400. The jury also found plaintiff's contributory negligence to be 36%, thereby reducing plaintiff's damages to $1,834,496. The circuit court entered judgment on the jury's verdict and denied defendant's posttrial motion seeking judgment *n.o.v.* and a new trial. Defendant now appeals.

## II. Analysis

### A. Judgment *n.o.v.*

Defendant first contends that the circuit court erred in denying its motion for judgment *n.o.v.* where plaintiff failed to prove a *prima facia* case of negligence.

A motion for judgment *n.o.v.* should only be granted in those limited cases where all of the evidence and the inferences therefrom, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. Thornton v. Garcini, 382 Ill. App. 3d 813, 817 (2008). When ruling upon such a motion, the court does not weigh the evidence or make determinations of credibility and must not substitute its judgment for that of the jury merely because there are other inferences or conclusions that the jury could have drawn or because there are other results that the court believes are more reasonable. Thornton, 382 Ill. App. 3d at 817. " 'The court has no right to enter a judgment [notwithstanding the verdict] if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome.' " Thornton, 382 Ill. App. 3d at 817, quoting Maple v. Gustafson, 151

Ill. 2d 445, 454 (1992). A trial court's ruling on a motion for judgment *n.o.v.* is subject to a *de novo* standard of review. Thornton, 382 Ill. App. 3d at 817.

In order to recover on a negligence claim, plaintiff must set out sufficient facts to establish that the defendant owed a duty to plaintiff, that defendant breached that duty, and that the breach proximately caused injury to plaintiff. Buerkett v. Illinois Power Co., 384 Ill. App. 3d 418, 422 (2008).

Defendant first argues that plaintiff failed to establish that it owed plaintiff a duty of care pursuant to section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts §414, 1965)), because there was no evidence that David was defendant's employee or agent and no evidence that defendant was the general contractor at the house construction project. We disagree.

An agency is a fiduciary relationship in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf. Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc., 326 Ill. App. 3d 126, 134 (2001). An agent's authority may be either actual or apparent, and actual authority may be either express or implied. Amcore Bank, N.A., 326 Ill. App. 3d at 134. In order to prove the existence of apparent authority, plaintiff must demonstrate that: (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) the third person reasonably concluded, based on the actions of the principal and agent, that the party was an agent of the principal; and (3) the third person justifiably relied on the agent's apparent authority to his detriment. Career Concepts, Inc. v. Synergy, Inc., 372 Ill. App. 3d 395, 404 (2007).

Here, we find that the evidence supports a finding that David was either an employee or agent of defendant. While Scott and David testified that David was not an employee of Yeager Construction at the time of the house construction project, plaintiff presented evidence to the contrary. Plaintiff testified that he was hired by David to perform masonry work and David indicated that Yeager Construction would guarantee his payment. Sam testified that Scott told him that David worked for Yeager Construction. Scott testified that he prepared a schedule and outline for the construction project, plaintiff's exhibit 12, that listed "Yeager Construction project management costs" and stated that David would be the superintendent and receive a monthly salary for project management and job supervision. Scott also acknowledged that monthly invoices for David's work were prepared on Yeager Construction letterhead.

Defendant, nonetheless, argues that there was no evidence that Yeager Construction was the general contractor and had the right to control David's activities at the jobsite. Defendant notes that David testified that he was hired and paid by the Shakirs to be a consultant and the Shakirs controlled his work activities. However, plaintiff introduced evidence that Scott created an outline of all of David's responsibilities at the jobsite, plaintiff's exhibit 12, which included tasks such as acquiring subcontractor bids, procuring contracts for subcontractors, scheduling and organizing subcontractors and quality control on the project. Scott agreed that the document showed that "David was acting as the superintendent and the representative of Yeager Construction." Scott also identified the AIA-101 contract which Scott signed, identifying Yeager Construction as the contractor and David as the "[c]ontractor's representative."

In addition, Sam testified that Scott told him that David worked for Yeager Construction

and David would supervise the construction project. Sam testified that Yeager Construction was the general contractor at the construction site and that the bank released the loan money directly to Yeager Construction. Sam testified that he worked at his gas stations in Indiana Monday through Friday and was only present at the construction site on weekends. Sam testified that Scott visited the construction site every month and Sam called Scott weekly for updates that Scott would obtain from David, who was at the construction site Monday through Friday. Sam also testified that David was hired to supervise and routinely inspect the construction site.

While we note that Hanson testified that Rubina signed an agreement with the Village of Northbrook in which Rubina requested to be her own contractor, Hanson explained that Northbrook's provisions were limited to "safety of the folks in the neighborhood, the adjacent property owners" and Northbrook does not get involved in compliance with OSHA or industry standards on the construction site. Sam also testified that Rubina had no experience running construction sites, including no experience with masonry, plumbing, excavation or concrete. Sam explained that Rubina was not the general contractor on the construction site and only signed the Village of Northbrook documents because Scott and David told her to do so.

Accordingly, plaintiff introduced sufficient evidence to dispute defendant's claims that David was not an employee or agent and that Yeager Construction was not the general contractor at the construction site. The jury could have assessed the credibility of the witnesses in favor of plaintiff by determining that Yeager Construction was the general contractor, which employed or granted authority to David. Since plaintiff demonstrated a substantial factual dispute, involving the assessment of credibility of the witnesses and the determination regarding conflicting evidence

is decisive to the outcome, a grant of judgment *n.o.v.* was not appropriate on this basis. Thornton, 382 Ill. App. 3d at 817.

Defendant next contends that defendant did not owe plaintiff a duty of care where plaintiff failed to prove the existence of a contract for masonry work between plaintiff and defendant. Defendant maintains that the evidence shows that plaintiff was hired by the Shakirs, rather than Yeager Construction. Contrary to defendant's assertion, plaintiff testified that David contacted him about the construction project, interviewed him, reached an oral agreement to hire him, and indicated that payment would be guaranteed by Yeager Construction. Sam also testified that Yeager Construction was the general contractor at the construction site and hired the subcontractors, including plaintiff. In addition, Scott testified that he created an outline of tasks for David, which included "acquiring subcontractor bids, procuring contracts for subcontractors, scheduling and organizing subcontractors and quality control on the project." Scott agreed that the document showed that David "was acting as the superintendent and the representative of Yeager Construction." Considering the contradictory evidence presented by plaintiff, defendant's motion for judgment *n.o.v.* was properly denied on this basis.

Defendant next contends that it owed no duty to plaintiff under section 414 of the Restatement (Second) of Torts, where plaintiff, himself, was an independent contractor rather than the employee of an independent contractor.

Section 414 of the Restatement provides an exception to the general rule that one who employs an independent contractor is not liable for the acts or omissions of the independent contractor. Downs v. Steel & Craft Builders, Inc., 358 Ill. App. 3d 201, 205 (2005). Section 414

of the Restatement (Second) of Torts provides:

> "One who entrusts work to an independent contractor, but who retains the control
> of any part of the work, is subject to liability for physical harm *to others* for whose
> safety the employer owes a duty to exercise reasonable care, which is caused by his
> failure to exercise his control with reasonable care." (Emphasis Added).
>
> Restatement (Second) of Torts §414 (1965).

In Connaghan v. Caplice, 325 Ill. App. 3d 245, 249 (2001), this court recognized that section 414 addresses the duty that an employer owes "to others," for example, employees of the independent contractor and other third parties. This court held that "[n]othing in this section of the Restatement imposes a duty upon employers that inures to an independent contractor." Connaghan, 325 Ill. App. 3d at 249. In Connaghan, this court found that because there was nothing in the record to establish that the plaintiff was anything but an independent contractor, section 414 of the Restatement was not applicable. Connaghan, 325 Ill. App. 3d at 249.

However, unlike Connaghan, in the present case there is evidence in the record to suggest that plaintiff worked for his own company, which had been hired by defendant as an independent contractor. The record shows that defendant alleged in its third-party complaint and amended third-party complaint that "At all relevant times, [plaintiff] was working for Anthony Grillo Construction, Inc.," and that "the Shakirs hired Anthony Grillo Construction, Inc. as a masonry subcontractor." Defendant should not be permitted to now argue on appeal that plaintiff was no more than an independent contractor himself. See Czarobski v. Lata, 227 Ill. 2d 364, 376 (2008), citing In re Stephen K., 373 Ill. App. 3d 7, 25 (2007) ("A party is estopped from taking a position

on appeal that is inconsistent with a position the party took in the trial court").

In addition, Sam testified that Yeager Construction hired plaintiff or Grillo Construction to perform the masonry work at the construction site. The record also shows that plaintiff submitted invoices under the name of "Anthony's Masonary." Plaintiff testified that he started with two employees on the construction site, which increased to seven employees in order to complete the work by winter. Plaintiff also testified that his employees built the scaffold and he supervised them. Further, Mooney testified that he was aware that plaintiff had operated a masonry company since the 1980s and received documents related to the state registration of the company owned by plaintiff. Based on the evidence in the record, we conclude that there was evidence to indicate that plaintiff's company was hired by defendant to perform the masonry work at the construction site.

Defendant argues that even if plaintiff established that he was a person who could be owed a duty under section 414, plaintiff failed to establish that defendant exercised sufficient control to owe a duty under section 414 of the Restatement.

Section 414 commonly arises when a general contractor entrusts work to a subcontractor but superintends the job himself or through a foreman. Restatement (Second) of Torts §414, Comment b, at 387-88. Under these circumstances, the general contractor is subject to liability if he knows or reasonably should know that the subcontractor work is being performed in a dangerous manner and fails to exercise his power of control to stop the work. Restatement (Second) of Torts §414, Comment b, at 387-88. In order for this rule to apply, the general contractor:

"[M]ust have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to [general contractors], but it does not mean that the [sub]contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the [sub]contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts §414, Comment c, at 388 (1965).

" 'The central issue is retained control of the independent contractor's work, whether contractual, supervisory, operational[] or some mix thereof.' " Wilkerson v. Schwendener, 379 Ill. App. 3d 491, 494 (2008), quoting Martens v. MCL Construction Corp., 347 Ill. App. 3d 303, 318 (2004). Generally, whether a general contractor retained sufficient control to trigger liability under section 414 is a question of fact. Wilkerson, 379 Ill. App. 3d at 494. Only when the evidence presented is insufficient to create a factual question can the issue be decided as a matter of law. Wilkerson, 379 Ill. App. 3d at 494.

In this case, there was sufficient evidence of retained control for the jury to decide whether defendant was liable under section 414. Defendant entered into a contract with the Shakirs which left defendant to control the operative details and safety at the construction site. The contract specified that defendant was "solely responsible" for the "construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work

under the Contract." The contract also specified that defendant was responsible for "all safety precautions and programs" and that defendant's superintendent would be the member of defendant's organization "whose duty shall be the prevention of accidents."

There was also evidence that defendant's actions on the jobsite indicated that defendant retained more than a general right of supervision. Scott testified that he prepared a schedule and outline of tasks for David, as the superintendent at the construction site. The schedule and outline provided that David would schedule and organize subcontractors and perform "quality control." The testimony at trial established that David was at the construction site on a daily basis and actively supervised the subcontractors and inspected the jobsite. Plaintiff also testified that he would be told to stop what he was doing and to start something else. Plaintiff's testimony, therefore, indicated that he was not entirely free to do the work in his own manner.

In addition, Scott testified that it was the responsibility of the general contractor to routinely inspect the construction site. Scott testified regarding the importance of backfilling and noted that even if another subcontractor performed the backfilling, it was still the general contractor's duty to make sure that a backhoe is used so that there are no safety hazards at the jobsite. Scott acknowledged that if a representative of a general contractor allowed work to continue on a jobsite where scaffolding was improperly supported, that general contractor was negligent. Accordingly, based on the evidence presented at trial, it cannot be said that no contrary verdict could ever stand. We, therefore, conclude that the evidence supports the circuit court's denial of defendant's motion for judgment *n.o.v.*

Even if we were to conclude that defendant did not exercise sufficient control to owe

plaintiff a duty under section 414 of the Restatement, the evidence showed that defendant owed

plaintiff a duty as possessor of the land under section 343 of the Restatement (Second) of Torts.

See Clifford v. Wharton Business Group, L.L.C., 353 Ill. App. 3d 34, 41 (2004) (sections 414

and 343 are not mutually exclusive; rather, each one offers an independent basis for recovery).

Plaintiff argues on appeal, and presented a similar argument before the circuit court, that a duty

arose where defendant failed to backfill and otherwise failed to correct hazardous conditions on

the jobsite.  This court may uphold on any basis appearing in the record.  Yoder v. Ferguson, 381

Ill. App. 3d 353, 372 (2008).

Illinois has adopted the rules set forth in sections 343 and 343A of the Restatement

(Second) of Torts regarding the duty of possessors of land to their invitees.  Section 343

provides:

"A possessor of land is subject to liability for physical harm caused to his invitees

by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover

the condition, and should realize that it involves an unreasonable risk

of harm to such invitees, and

(b) should expect that they will not discover or realize the danger,

or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the

danger." Restatement (Second) of Torts §343 (1965).

Illinois courts recognize an "open and obvious" exception to the duty of care owed by possessors of land to invitees, as it is not forseeable that an invitee will be injured when the condition is obvious or known. Buerkett, 384 Ill. App. 3d at 422. The open-and-obvious exception is outlined in section 343A of the Restatement (Second) of Torts, which provides:

"A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." Restatement (Second) of Torts §343A(1), at 218 (1965).

Plaintiff argues that even if the uneven ground and unsafe scaffold were "open and obvious" conditions, the deliberate encounter exception applies to impose liability on defendant.

The deliberate encounter exception states that a possessor of premises is liable for an open and obvious hazard "when the possessor 'has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.' " LaFever v. Kemlite Co., 185 Ill. 2d 380, 391 (1998), quoting Restatement (Second) of Torts §343A, Comment f (1965). The focus with the deliberate encounter analysis is on what the possessor of land anticipates or should anticipate the entrant will do. Buerkett, 384 Ill. App. 3d at 422-23. "[L]iability stems from the knowledge of the possessor of the premises, and what the possessor 'ha[d] reason to expect' the invitee would do in the face of the hazard." LaFever, 185 Ill. 2d at 392, quoting Restatement

(Second) of Torts §343A, Comment f (1965). Under this exception, individuals will make deliberate choices to encounter hazards when faced with employment concerns, and those encounters are reasonably foreseeable by possessors of property. LaFever, 185 Ill. 2d at 394-95.

Here, while the holes and trenches on the construction site were open and obvious, plaintiff testified that he had spoken with David about the condition at the construction site and had asked David to backfill from "day one" and every day thereafter for two months. Plaintiff testified that he observed that the back two legs of the scaffold were placed on cinder blocks due to the open holes at the construction site. Plaintiff also testified that setting up a scaffold on cinder blocks violated OSHA regulations and construction industry custom and practice. Despite being aware of the dangerous condition, plaintiff testified that due to pressure to complete his work, he decided to climb the scaffold to take window measurements in order to proceed with his next phase of work. The deliberate encounter exception was, therefore, applicable in this case where plaintiff informed defendant of the dangerous condition where he was working, and defendant had reason to expect that plaintiff would continue working despite the dangerous condition in order to complete his work in a timely manner.

Defendant next contends that even if it owed a duty to plaintiff, no evidence was presented to establish that its conduct was a proximate cause of plaintiff's injury.

To establish proximate cause, plaintiff must first show that defendant's negligence was the actual cause of the injury. Yoder, 381 Ill. App. 3d at 372. The negligence at issue must be a material and substantial factor in the injury and not just furnish a condition by which the injury is

made possible. Yoder, 381 Ill. App. 3d at 372. Plaintiff must also show that defendant was the legal cause of the injury by proving that defendant's conduct was so closely tied to the injury that he may be found legally responsible. Yoder, 381 Ill. App. 3d at 372.

Here, defendant argues that there was no evidence from which the jury could infer that the ground conditions caused the scaffold to fall off the cinder blocks causing defendant's injury. Defendant also argues that its conduct was not the legal cause of injury where the harm to plaintiff was not "reasonably foreseeable." However, several witnesses testified that backfilling is important to provide a safe, level surface which can support a scaffold. Plaintiff testified that after his fall, he observed that the scaffold was at an angle and no longer supported by the cinder blocks. Plaintiff's expert also testified that it was his opinion, based upon the photographs of the ground conditions and testimony he reviewed, that the unsafe support for the scaffold caused plaintiff's injury. With respect to defendant's foreseeability argument, plaintiff testified that he repeatedly asked David to backfill and plaintiff's requests were ignored. Plaintiff testified that due to pressure to complete his work, he climbed the unsafe scaffold to take measurements.

We note that the jury is charged with deciding the issue of proximate cause, and to support a motion for judgment n.o.v., the evidence viewed in a light favorable to plaintiff must overwhelmingly favor the movant so that "no contrary verdict *** could ever stand." Yoder, 381 Ill. App. 3d at 373. We find that it cannot be said that, based on the evidence presented at trial, no contrary verdict could ever stand. Accordingly, we conclude that the evidence supports the circuit court's denial of defendant's motion for judgment n.o.v.

1-07-2335

B. Defendant's Motion for a New Trial

Defendant next contends that the circuit court erred in denying its motion for a new trial where several trial errors unfairly prejudiced its defense.

Generally, a trial court's ruling on a motion for a new trial is reviewed for an abuse of discretion. Ruffin ex rel. Sanders v. Boler, 384 Ill. App. 3d 7, 17 (2008). The trial court's decision is subject to this deferential standard because the trial court had the benefit of previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility. Boler, 384 Ill. App. 3d at 17.

1. Testimony of Plaintiff's Treating Physicians

Defendant argues that the circuit court erred in allowing Dr. Santucci, one of plaintiff's treating physicians, to testify in plaintiff's case by way of an evidence deposition. Defendant notes that plaintiff failed to disclose the opinions or testimony that Dr. Santucci would give pursuant to Supreme Court Rule 213(f) (210 Ill. 2d R. 213(f)). Defendant argues that this failure to disclose was a violation of Rule 213(f), and the circuit court therefore should have barred Dr. Santucci from testifying. According to defendant, it was reversible error for the circuit court to allow this testimony.

Rule 213(f) provides, in pertinent part:

"Upon written interrogatory, a party must furnish the identities and addresses of witnesses who will testify at trial and must provide the following information:

-28-

1-07-2335

     \* \* \*

     (2) *Independent Expert Witnesses.* \* \* \* For each independent expert witness, the party must identify the subjects on which the witness will testify and the opinions the party expects to elicit." 210 Ill. 2d R. 213(f)(2).

The committee comments to Rule 213(f) state: "The purpose of this paragraph is to prevent unfair surprise at trial, without creating an undue burden on the parties before trial." 210 Ill. 2d R. 213(f), Committee Comments (March 28, 2002).

     In this case, while plaintiff stated that he provided Dr. Santucci's reports in advance of the deposition, plaintiff did not disclose the subject and opinions that Dr. Santucci would testify to pursuant to Rule 213(f). In determining whether the circuit court erred in allowing Dr. Santucci's evidence deposition to be read to the jury, this court considers the following factors: (1) the surprise to the adverse party; (2) the prejudicial effect of the testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timely objection to the testimony; and (6) the good faith of the party calling the witness. Pancoe v. Singh, 376 Ill. App. 3d 900, 913 (2007).

     The circuit court's decision to exclude or admit evidence is reviewed under an abuse of discretion standard and will not be reversed absent an abuse of that discretion. Pancoe, 376 Ill. App. 3d at 913. An abuse of discretion may be found only where no reasonable man would take the view adopted by the circuit court. Pancoe, 376 Ill. App. 3d at 913.

     In denying defendant's motion to bar Dr. Santucci's evidence deposition, the circuit court applied the relevant factors and found the following:

-29-

"We have a fusion, pretty serious injury, no prior evidence of any accidents, and treatment since then. The testimony of this doctor I don't think comes as a complete surprise. It's an extension of [Dr.] Bauer and other treatment. It's prejudicial effect - obviously all such evidence is prejudicial in that it hurts the defendant. But I don't see it as outweighing any probative value. The nature of the testimony is pretty consistent with, I think, what plaintiff testified to, and you have deposed the plaintiff and these other doctors. I think it is a timely objection and I do have a question as to the good faith of the plaintiff[] being diligent.

However, looking at this in its totality, I would respectfully deny the motion to exclude and the motion to bar."

We find no abuse of discretion by the circuit court in admitting the evidence deposition of Dr. Santucci. While the circuit court found that defendant's objection was timely and had some question about plaintiff's diligence, the other relevant factors weighed in favor of admitting the evidence. The evidence did not unfairly surprise or prejudice defendant. Dr. Santucci was disclosed as an expert witness and plaintiff provided defendant with her reports in advance of the deposition. Dr. Santucci's testimony regarding plaintiff's pain, which she attributed to his fall from the scaffold, was also cumulative of early testimony provided by Dr. Bauer, plaintiff's other treating physician. Dr. Bauer testified that although plaintiff had recovered from his initial spinal cord injury, plaintiff was being treated with narcotics, which would preclude him from working. In addition, the nature of Dr. Santucci's testimony was consistent with the testimony provided by

Dr. Bauer and plaintiff himself. Plaintiff testified that after his fall from the scaffold, he continued to have tremendous pain and suffers from personality changes and nausea from the narcotic pain relievers he must take. The circuit court properly considered the relevant factors and we find no abuse of discretion in allowing this testimony.

Defendant also argues that the circuit court should have barred Dr. Bauer's testimony where defendant learned of Dr. Bauer's most recent examination of plaintiff shortly before Dr. Bauer took the stand. Defendant asserts that Dr. Bauer testified that he treated plaintiff from October 31, 2001, to November 14, 2001, but defendant learned just before his testimony that Dr. Bauer examined plaintiff on February 26, 2007. Defendant maintains that due to plaintiff's failure to disclose this recent examination pursuant to Rule 213(f), the circuit court should have barred Dr. Bauer's testimony.

After considering the relevant factors, we find no abuse of discretion in allowing Dr. Bauer's testimony. The record shows that plaintiff stated that he had learned of the February 26, 2007, examination at the same time that defendant learned of it, and neither defendant nor the circuit court questioned plaintiff's good faith or diligence. In addition, we find the fact that Dr. Bauer conducted an additional examination of plaintiff did not cause unfair surprise or prejudice to defendant. Dr. Bauer's opinion at trial that plaintiff's injury and surgery left him with permanent disability were consistent with his opinion at his discovery deposition.

## 2. Admission of the AIA-101 Contract

Defendant next argues that the circuit court committed reversible error by admitting the AIA-101 contract into evidence where neither Scott nor Sam testified that it was a valid and existing contract between them. Defendant maintains that without such testimony, plaintiff failed to provide authentication and identification to admit the document into evidence.

Each party is entitled to present evidence that is relevant and material to its theory of the case. 1601 South Michigan Partners v. Measuron, 271 Ill. App. 3d 415, 417 (1995); see also Glabman v. Bouhall, 81 Ill. App. 3d 966, 969 (1980) (a contract that is unsigned by the party to be charged may be admissible if it is material to the theories of the case, even if said contract eventually proves to be unenforceable). Evidence tending to show conduct inconsistent with an opponent's theory is also admissible. 1601 South Michigan Partners, 271 Ill. App. 3d at 417.

Here, Scott testified that he created the AIA-101 document and both parties' signatures were identified at trial. Scott also testified that he had "an AIA contract as the only contract I made with [the Shakirs]." In addition, Sam testified that defendant was the general contractor of the construction project, which is reflected in the document. While defendant denied that it was the general contractor at the construction site, the document provided evidence of conduct that was inconsistent with defendant's position. We therefore find no abuse of discretion by the circuit court in admitting the document.

## 3. Alleged Improper Remarks by Plaintiff's Attorney

Defendant next argues that it was unfairly prejudiced by plaintiff's counsel's insinuations that Scott's conduct with respect to signing the AIA-101 document was fraudulent or criminal.

" 'Although improper argument and attorney misconduct can be the basis for granting a new trial, that determination is left to the sound discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. [Citation]. The attitude and demeanor of counsel, as well as the atmosphere of the courtroom, cannot be reproduced in the record, and the trial court is in a superior position to assess and determine the effect of improper conduct on the part of counsel. [Citation].' " First National Bank of La Grange v. Glen Oaks Hospital & Medical Center, 357 Ill. App. 3d 828, 833 (2005), quoting Zuder v. Gibson, 288 Ill. App. 3d 329, 338 (1997). Generally, a reviewing court will not find reversible error due to improper comments by counsel unless a party has been substantially prejudiced by such comments. First National Bank of La Grange, 357 Ill. App. 3d at 833. In addition, if the trial was fair as a whole and the evidence was sufficient to support a jury's verdict, a case will not be reversed upon review. First National Bank of La Grange, 357 Ill. App. 3d at 833.

Defendant first complains that plaintiff's counsel made improper comments regarding the AIA-101 document during opening statements. During opening statements, plaintiff's counsel stated:

> "Scott is going to get up there and tell you, I wasn't the general contractor. I didn't have any intention of being the general contractor, but I put my name on that contract so the bank would think that I was the general contractor so Sam Shakir can get an $800,000 [loan].
>
> Now, ladies and gentlemen, this is not a criminal trial, so don't be in any way concerned about that."

Following plaintiff's counsel's statement, the circuit court sustained defendant's objection and stated "Let's not get into anything about what kind of trial this is." The circuit court's sustaining of the objection and instruction cured any prejudicial impact of counsel's statement. See Clayton v. County of Cook, 346 Ill. App. 3d 367, 383 (2003) (generally, sustaining an objection and giving an instruction to the jury cures any prejudicial impact of an error).

Defendant next argues that plaintiff's counsel improperly attacked Scott's credibility on the stand by suggesting to the jury that he had committed a crime. During plaintiff's counsel's cross-examination of Scott, the following exchange occurred:

"Q. So you are telling us that you weren't the general contractor, but that you were going to be handed *** $800,000 that the bank is handing out on this loan that you are guaranteeing by saying you are the general contractor and the bank is going to hand that money to you, isn't it?

A. It did not actually but that's the general idea.

Q. That's the way it works, isn't it? When you did this document, when you signed the document, did you think you were committing a crime?

A. No.

[Defendant's counsel]: Objection.

THE COURT: Objection will be sustained. Jury will disregard usage of such terminology.

Q. When you signed that document, did you want the bank to rely upon your representation that you were going to be the general contractor on this site?

A. Yes."

1-07-2335

Here, the circuit court's actions in sustaining the objection and giving an instruction to the jury to disregard the terminology used by plaintiff's counsel cured any prejudicial impact. The record shows that plaintiff's counsel then continued questioning Scott without using the terminology.

Defendant also argues that while cross-examining David, plaintiff's counsel insinuated that Scott engaged in misconduct in connection with signing the AIA-101 document. Defendant complains of the following line of questioning:

"Q. If Scott Yeager told this jury that he signed that document without ever intending to provide any contractor services but so that that document would go to a bank and that bank would then agree based upon that document to release over $800,000 to the Shakirs, how does that factor into your appraisal of Scott Yeager's integrity?

[Defendant's counsel]: Objection. Form. Foundation. Mischaracterization.

THE COURT: As to form and foundation, the objection is sustained."

Again, the record shows that the circuit court sustained defense counsel's objection with respect to the complained-of testimony. We also note that prior to this complained-of testimony, plaintiff's counsel asked David, "Would it surprise you if your brother signed an AIA contract with Sam Shakir to build his home?" David responded, "Not really. *** Because of his integrity." Plaintiff's counsel's line of questioning was in response to David's testimony regarding Scott's integrity in signing the AIA-101 document.

Defendant lastly argues that during closing arguments, plaintiff's counsel improperly stated that the AIA-101 document was "fraudulent," in violation of the circuit court's order

-35-

prohibiting the use of such characterization.

The record shows that during closing arguments, plaintiff's counsel argued the following:

"[T]hat brings us to what Scott Yeager said. I only signed this document only so the Shakirs could get a bank loan, only so the Shakirs could get $824,000, but I never intended to agree to any of the terms or do any of the work that was outlined in the contract.

This bank sure thought he did. The bank needed this for collateral. The bank wouldn't give him any money without this document. Scott Yeager signs a document, hands it over to the bank in lieu of $824,000, and comes in here and tells you that the document is fraudulent?"

At the close of proceedings, defendant's counsel moved to dismiss plaintiff's case or for a mistrial based on plaintiff's counsel's violation of the court's order by referring to "fraud." The circuit court stated that it did not sustain defendant's objection to plaintiff's counsel's argument because it "didn't want to call any undue influence to that." The court explained:

"I felt that if I had sustained the objection and admonished the jury at that point it might not have served a purpose. It's always a judgment call, so that's why I did what I did.

I heard [defendant's] objection and I agreed with your objection, but not as strenuously as you are arguing it here. I think that many courts might allow that kind of argument in terms of interpreting this as a fraudulent misrepresentation. Misrepresentation would have been a better term to use. I don't feel having seen

this trial go on and watch these lawyers and how they've operated here and although the record doesn't show you the emotions that were tied to the arguments both sides were vociferous and emotional in the arguments. And I don't feel that [plaintiff's counsel] was acting in an intentional disregard for court order. And that's why I didn't act on it the moment the jury walked out. *** I think when you're arguing the case and you're talking about a case that's been going on for two weeks here, emotions run high.

And I compliment the lawyers on their vigor in their arguments."

Based on the circuit court's explanation of the circumstances in the courtroom and the court's reluctance to call attention to plaintiff's counsel's argument, we find no abuse of discretion by the circuit court in denying defendant's request for dismissal or a new trial.

### 4. Defendant's Special Interrogatory

Defendant next argues that it was entitled to a new trial where the circuit court refused to submit a special interrogatory on the issue of whether plaintiff was an independent contractor on the date of his injury.

As defendant points out, "a trial court has no discretion to reject a special interrogatory that is proper in form." Oldenstedt v. Marshall Erdman & Associates, Inc., 81 Ill. App. 3d 1, 15 (2008). However, the trial court does retain a traditional right of discretionary control over its own docket. Oldenstedt, 381 Ill. App. 3d at 15. With respect to the proposed special interrogatory, the record shows that the circuit court noted that "there are enough theories flying around here that this issue is really kind of moot." The court then indicated, "I wish you had

submitted it last night, not ten minutes after we're supposed to give closing arguments." The court found that "it's late, and for the reasons that I've stated it's denied." We find no reversible error occurred where the circuit court found that defendant failed to present the interrogatory in a timely manner.

In addition, a special interrogatory is presented in proper form if: (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned. Simmons v. Garces, 198 Ill. 2d 541, 563 (2002). The issue whether plaintiff was an independent contractor is not an ultimate fact upon which plaintiff's right to recover depended and the answer would not be inconsistent with a general verdict finding defendant negligent. As previously discussed, the jury's award could be affirmed based on plaintiff's premises liability theory, which is not dependent upon or inconsistent with plaintiff's alleged status as an independent contractor.

### C.  Defendant's Contribution Counterclaim Against the Shakirs

Defendant lastly contends that the circuit court erred in entering summary judgment in favor of the Shakirs and dismissing defendant's contribution counterclaim against them prior to trial.

A grant of summary judgment is appropriate when the pleadings, depositions, admissions, and affidavits demonstrate no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2006). The pleadings, depositions, and admissions are to be construed against the party moving for summary judgment. Buerkket, 384 Ill. App. 3d at 421. If reasonable persons may draw different inferences from the undisputed

1-07-2335

facts or if material facts are disputed, summary judgment is precluded. Buerkket, 384 Ill. App. 3d at 421.

> " 'Although summary judgment can aid in the expeditious disposition of a lawsuit, it remains a drastic means of disposing of litigation and, therefore, should be allowed only where the right of the moving party is clear and free from doubt. [Citation.] If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is proper. [Citations.]' " Buerkket, 384 Ill. App. 3d at 421, quoting Williams v. Manchester, 228 Ill. 2d 404, 417 (2008).

We review *de novo* the circuit court's grant of a motion for summary judgment. Buerkket, 384 Ill. App. 3d at 421.

The Shakirs initially argue that defendant waived this issue for review by failing to argue against the grant of summary judgment in the Shakirs' favor. However, the record shows that shortly before trial, defendant moved to vacate the summary judgment as to plaintiff's claim against the Shakirs. The Shakirs opposed that motion and also moved to dismiss defendant's counterclaim. Defendant, in turn, opposed the Shakirs' motion. The circuit court denied defendant's motion to vacate and granted the Shakirs' motion to dismiss defendant's counterclaim. The record therefore does not establish that defendant acquiesced to the grant of summary judgment, which dismissed defendant's contribution counterclaim.

Forfeiture aside, we find that the circuit court properly entered summary judgment where defendant failed to provide any showing that the Shakirs retained control over the construction project and safety at the jobsite. Defendant argues that the Shakirs acted as their own general

-39-

contractor and retained control over the construction site. Defendant supports this claim with the facts that Rubina signed documents with the Village of Northbrook with her name as the general contractor and that the Shakirs hired and directly paid subcontractors. However, these facts are insufficient to support a finding that the Shakirs were in charge of the construction and safety of their house. See Gentile v. Kehe, 165 Ill. App. 3d 802, 806 (1988) (evidence that homeowner hired subcontractors and negotiated and agreed upon terms of their contracts, and in applying for a building permit filled in the blank requesting the name of the general contractor with his own name was insufficient to sustain construction worker's burden of showing that the homeowner was in charge and control of work). Here, there was no evidence to show that the Shakirs had any control over the construction and safety. Rather, the evidence indicated that the Shakirs did not participate in the work, did not supervise or direct the work, did not furnish any materials, tools, or equipment, did not supervise safety at the construction site and did not give orders to the workers. Accordingly, defendant did not meet its burden to show a factual basis that the Shakirs retained control of the work and safety at the construction site.

For the above reasons, we affirm the judgment of the circuit court.

Affirmed.

MURPHY, P.J., and COLEMAN, J., concur.

1-07-2335