# Illinois Official Reports

## Appellate Court

---

*Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219

---

| | |
|---|---|
| Appellate Court Caption | JOI JEFFERSON, as Special Representative of the ESTATE OF JEANETTE TURNER, Deceased, Plaintiff-Appellee, v. MERCY HOSPITAL & MEDICAL CENTER, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-16-2219 |
| Filed | February 6, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-L-5913; the Hon. Clare E. McWilliams, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |
| Counsel on Appeal | Hall, Prangle & Schoonveld, LLC, of Chicago (Hugh C. Griffin, Jacob Z. Goldstein, Benjamin E. Patterson, Katherine L. Dzik, and Steven Starnes, of counsel), for appellant.<br><br>Lane & Lane, LLC (Stephen I. Lane and Scott D. Lane, of counsel), and Michael W. Rathsack, both of Chicago, for appellee. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion. Presiding Justice Neville and Justice Pucinski concurred in the judgment and opinion. |

¶ 1     Defendant, Mercy Hospital & Medical Center (Mercy), appeals from a jury verdict in favor of plaintiff, Joi Jefferson, in the amount of $22,185,598.50. This case began as a medical malpractice action by plaintiff's mother, Jeanette Turner, who alleged that due to the negligence of Mercy's nurses and doctors, a clot occluded her tracheostomy tube and caused respiratory arrest, ultimately resulting in permanent brain damage. After the case was submitted to the jury, but before a verdict was returned, Jeanette died and plaintiff was appointed as special representative of her estate to receive the jury's verdict.

¶ 2     On appeal, Mercy seeks a judgment *n.o.v.* or a new trial on the grounds that (1) plaintiff failed to prove Mercy's negligence caused her injury, (2) the trial court erred in admitting certain evidence regarding Jeanette's blood clot, and (3) plaintiff was erroneously permitted to introduce a new theory of negligence on rebuttal. Mercy further argues that the jury's verdict for future damages should be vacated due to Jeanette's death and that the $1 million award for past emotional distress should be set aside as duplicative of the $500,000 past pain and suffering award and the $2 million award for past loss of normal life. We vacate the jury's award of future damages and otherwise affirm the judgment.

¶ 3     On February 22, 2005, Jeanette was admitted to Mercy with Ludwig's angina, a life-threatening condition in which an abscess causes swelling in the floor of the mouth, which, in Jeanette's case, had progressed to involve swelling of her neck and airway. She was taken to the operating room, where a tracheostomy was performed by Drs. Benjamin Gruber (an ear, nose, and throat (ENT) doctor), and Jason Cundiff (a fourth-year ENT resident) under local anesthesia.

¶ 4     A tracheostomy involves the placement of an artificial device known as a trach tube in the patient's trachea, or windpipe; the purpose of which is to restore a patient's airway. The collar of the trach tube is sutured to the skin with a strong stitch. Inside the trach tube is a cuff, that, when inflated, expands to fill the trachea and prevents a patient from breathing through their nose; they can only breathe through the trach. A cuff must ordinarily be inflated or deflated with a syringe, but an inflated cuff can deflate as a result of a leak. When a cuff is inflated, it provides protection to the airway from materials such as blood, which are prevented from traveling below the trach tube. Blood that travels below the tube runs the risk of clotting if it is not suctioned or coughed out. When the cuff of a trach tube is inflated, the patient cannot speak.

¶ 5     In the operating room, the cuff in Jeanette's trach tube was inflated to allow the anesthesiologist to administer gas and ventilate her while she was undergoing surgery. Jeanette's surgery was successful and the abscess in her mouth was drained, but following surgery on February 23, Jeanette experienced some bleeding at the trach site and also complained of a choking sensation. Plaintiff's expert, Dr. Scott Graham, an ENT doctor, explained that both effects were normal. Because the trach site is an open wound, some bleeding is to be expected. This is particularly true when a patient is on blood thinners, as Jeanette was for a preexisting heart condition In addition, when a trach is first placed and the cuff is inflated, many patients complain of a choking sensation.

¶ 6     The bleeding resolved over the next several days, and Dr. Cundiff deflated the cuff, but on February 27, bleeding recommenced at 8 p.m. At that time, nurse Debra Rohrwasser redressed

the site, but several hours later, at 11:30 p.m., she again noticed bloody, watery drainage from the trach. She did not notify a doctor.

¶ 7    The morning of February 28, Jeanette was taken to the cardiac catherization lab (cath lab) for a test of her artificial heart valve. Dr. Cundiff was in attendance. Upon observing persistent bleeding from the stoma (the hole in the throat where the trach is placed), Dr. Cundiff cauterized it with silver nitrate and packed the stoma with gauze, which partially controlled the bleeding. Dr. Graham explained that this procedure coagulates the blood vessels and stops bleeding. Dr. Cundiff reinflated the cuff at this time, which would have left Jeanette unable to speak.

¶ 8    Following her procedure at the cath lab, Jeanette was taken to the medical-surgical floor of Mercy. There, she was initially under the care of nurse Michele Findrick. Nurse Findrick testified that Jeanette arrived on her floor at 5:30 p.m., after a delay due to the bleeding from her trach site. When nurse Findrick first assessed Jeanette, she did not observe bleeding, but noted that Jeanette was sitting up and in good spirits. At trial, nurse Findrick testified that she could not recall whether Jeanette was speaking, but in her deposition, the nurse testified that Jeanette was talking. After nurse Findrick left the room, a family member, later identified as Jeanette's sister, Annette, informed her that Jeanette was bleeding. Nurse Findrick confirmed that blood was trickling from the trach site and also saw blood on Jeanette's hospital gown. The nurse gave gauze to Annette and told her to press it to the trach site. When the blood soaked through the gauze, nurse Findrick paged Dr. Cundiff, who came to see Jeanette and took her off the blood thinners and ordered two units of red blood cells to replace lost blood, as well as four bags of fresh frozen plasma, which would promote clotting. Dr. Cundiff did not expect the bleeding to resolve until all bags of plasma were administered.

¶ 9    Nurse Findrick was off duty at 7 p.m., at which time she testified that Jeanette was no longer bleeding but talking and sitting up. Nurse Jasmin David took over for nurse Findrick and continued to monitor Jeanette's condition. She administered the first bag of fresh frozen plasma at 8:30 p.m. and the last at 12:30 a.m. In addition, throughout the night, nurse David suctioned the trach, reinforced the dressing, and monitored Jeanette's vital signs, which were normal until just before she lost consciousness at 12:50 a.m. Nurse David testified that the suctioning produced minimal bloody output with "small snippets" of blood. Nevertheless, at 11 p.m., nurse David noted in the chart that Jeanette was coughing out blood and clots and wrote that Jeanette was "[c]omplaining of pain and stated that 'these blood clots are choking me.' " At trial, David explained that Jeanette did not actually speak but communicated through writing. In response to Jeanette's complaints, at 11 p.m., nurse David paged Dr. Karen Noriega, a first-year resident at Mercy, who was assigned to "night float" duty.

¶ 10    According to both nurse David and Dr. Noriega, Dr. Noriega arrived in response to the page but did not note her visit on Jeanette's chart. Dr. Noriega explained that she failed to notate the chart because Jeanette was stable without active bleeding, although she did observe dried blood.

¶ 11    Dr. Noriega was paged a second time at approximately midnight. At that time, she made an entry in Jeanette's chart reflecting that Jeanette had blood around the trach site with blood clots being coughed out and that Jeanette "stated" she was choking and could not breathe. At trial, Dr. Noriega clarified that she did not personally observe Turner coughing blood clots, but that she learned it from Annette. She also clarified that Annette told her Jeanette was choking.

Ultimately, Dr. Noriega paged Dr. Dayakar Reddy, a resident at Mercy who was also on her night float team, in response to Annette's pleas to "do something."

¶ 12 When Dr. Reddy arrived, he saw Annette's hands hovering near Turner's trach site. His note reflected that both Jeanette and Annette were trying to stop the bleeding by applying pressure and adjusting the trach. At trial, Dr. Reddy admitted that he was actually unable to see what Annette and Jeanette were doing when he entered the room. He asked Annette to leave so that he could examine Jeanette, and then he called security. After Annette left, he began examining Jeanette and did not note any blood or clots. Jeanette then lost consciousness in front of him, and Dr. Reddy called a code blue. Dr. Reddy immediately attempted to ventilate Jeanette through the trach tube by using an Ambu bag but encountered resistance in pushing air through the bag. It was only after an anesthesiologist arrived a few minutes later and adjusted the trach that Dr. Reddy was able to successfully ventilate Jeanette. Mercy stipulated that it was unable to identify the anesthesiologist who responded to the code.

¶ 13 Dr. Cundiff also responded to the code, arriving at the hospital from his home at approximately 1 a.m. Upon his arrival, he was told that Annette had dislodged the trach. Dr. Cundiff used a laryngoscope to probe the trach tube but did not see evidence of a blood clot and did not remove a blood clot. However, in his notes, he recorded that the airway was "occluded." At trial, he explained this meant that when he inserted the laryngoscope, the tip of the trach tube was not in the trachea, but resting against tissue, and was dislodged rather than blocked. Dr. Cundiff went on to testify that he would not have done anything differently if he had been contacted sooner. He acknowledged that he saw the trach tube after the anesthesiologist had repositioned it, and he did not know whether it was dislodged prior to the repositioning. Further, he admitted that it would have been difficult to reposition the trach tube if the cuff was inflated.

¶ 14 Annette provided further details of the events of that night. When Jeanette returned to her room after the procedure at the cath lab, Annette saw blood around Jeanette's neck and on her nightgown, as well as blood coming out of the trach site. In accordance with nurse Findrick's instruction, Annette placed gauze around Jeanette's neck to stop the bleeding, but neither she nor Jeanette touched the trach. As the bleeding worsened, the nurse gave Annette towels instead of gauze. Annette further testified that the nurse told her she was suctioning out blood and mucus during the night. Annette testified inconsistently about when doctors came to attend to her sister, initially saying that no doctors were present between 10:30 p.m. and 12:30 a.m. but later recalling that she had seen Dr. Noriega more than once before the code. With regard to Jeanette's vocalization, Annette testified that at 10 p.m. she heard Jeanette speak to complain of choking.

¶ 15 After Annette was asked to leave her sister's side immediately before the code, she waited in the prayer room on the same floor across from Jeanette's room. A tall black woman with an Afro hairstyle who was wearing scrubs came to the room some time later and said "the doctor who put the trach in found a blood clot." Mercy never identified this individual.

¶ 16 Jeanette was without oxygen for approximately 20 to 25 minutes before she was resuscitated and taken to the intensive care unit (ICU). She remained in the hospital until the end of March 2005. During her stay at Mercy, six hospital records by five different doctors all reflected that Jeanette's arrest was caused by a clot in her trach tube. Specifically, between March 24 and March 31, a transfer note, an acceptance note, two consult requests, a note from pulmonary service, and a discharge note all state that Jeanette suffered an anoxic brain injury

after a clot lodged in Jeanette's trach tube, and five of those six notes indicate that an ENT doctor removed the clot. Mercy did not call any of these doctors to testify at trial. As a result of her injury, Jeanette sustained brain damage and partial paralysis.

¶ 17 Both parties introduced expert testimony regarding the standard of care and the cause of Jeanette's injuries. Dr. Graham testified on behalf of plaintiff that while Dr. Cundiff's treatment of Jeanette in the cath lab complied with the standard of care, as did his 7 p.m. order to stop the blood thinners and administer bags of fresh frozen plasma, the standard of care required Dr. Cundiff to follow up on this treatment plan. Specifically, Dr. Graham opined that Dr. Cundiff should have called the hospital to learn of Jeanette's continued bleeding and then reexamine her. That examination would have led Dr. Cundiff to take steps to stop the continued bleeding and ensure that the trach tube was patent and that the cuff was inflated. Given that the bleeding was coming from the stoma, Dr. Graham believed that additional packing and cauterization would have been appropriate. Likewise, when Dr. Noriega was paged at 11 p.m., the standard of care required her to locate the source of the bleeding and ensure Jeanette's airway remained open. The doctors' failure to do so and the nurses' failure to timely contact the doctors proximately caused Jeanette's injuries.

¶ 18 Dr. Dorothy Cooke, a registered nurse and a PhD in health organization research, testified as plaintiff's expert in nursing care. Dr. Cooke opined that the standard of care for a nurse managing a patient who has a tracheostomy is to keep the airway clear through continuous suctioning and keep the stoma clean. A nurse who notices occlusion in a trach tube is required to contact a doctor immediately. Dr. Cooke testified that both nurses Rohrwasser and David failed to comply with the standard of care when they did not call for a doctor after observing bleeding. She further testified that this breach caused the clot to form and resulted in Jeanette's arrest. On cross-examination, Dr. Cooke admitted that an occlusion can form even where there has been compliance with the standard of care.

¶ 19 Dr. Boris Vern, plaintiff's expert in neurology, and Dr. Jack Hirsh, plaintiff's expert in hematology, both opined that the cause of Jeanette's arrest and subsequent brain damage was a clot in the trach tube. They based their opinions on the documented fact that Jeanette was coughing out clots and blood.

¶ 20 In contrast, Mercy's ENT expert, Dr. Pierre Lavertu, testified that all of Mercy's doctors and nurses complied with the standard of care and earlier intervention by an ENT would not have prevented Jeanette's injury due to the fact that the cause of the arrest, in his opinion, was trach dislodgment due to Jeanette's and Annette's manipulation of the tube. With regard to Dr. Reddy specifically, Dr. Lavertu opined that it was fortunate Dr. Reddy witnessed the arrest as he was able to call the code and address the problem immediately.

¶ 21 Dr. Lavertu explained that Jeanette's complaints of choking were due to the reinflation of the cuff in the cath lab. He further testified that in his experience, it was common for bleeding to occur five to six days after placement of the trach and the bleeding did not require a nurse to notify a doctor. Although Dr. Lavertu was not aware of the notes in Jeanette's chart reflecting a blood clot, he explained that oftentimes medical records "are not as accurate as we'd like them to be."

¶ 22 Dr. Daniel Derman, Mercy's internal medicine expert, concurred with Dr. Lavertu's opinions both with respect to the cause of Jeanette's injuries and the inaccuracy of the medical records. Specifically, Dr. Derman testified that Jeanette's tracheostomy complication was caused by dislodgment or malpositioning of the trach tube that was in turn the result of Jeanette

and Annette manipulating the tube. And with respect to the medical records to the contrary, Dr. Derman testified that when a patient is transferred among departments, the treating doctors look through the patient's chart to write a history of the case and often based their notes on the most recent transfer note. Thus, Dr. Derman explained, the first doctor saw a mention of a clot, and that was repeated (inaccurately) by later doctors treating Jeanette.

¶ 23    Dr. Jacob Bitran, Mercy's expert in hematology, also believed that Jeanette's arrest was not caused by bleeding or a blood clot. Dr. Bitran explained that if clots were present in Jeanette's trach tube, there would have been blood in her chest X-ray taken after the code. However, Dr. Bitran admitted that the only basis he had for concluding that Jeanette's arrest was caused by dislodgement of the trach tube was Dr. Reddy's observation that Annette and Jeanette had their hands in the vicinity of the tube before the arrest, and he was unaware of Dr. Reddy's trial testimony disavowing his ability to see what Annette and Jeanette were doing when he entered the room.

¶ 24    Finally, Mercy's nursing expert, Karen Krooswyk, testified that the nurses complied with the standard of care and were not required to call a doctor any sooner than they did.

¶ 25    Plaintiff was permitted to recall Dr. Graham to rebut Dr. Lavertu's testimony implying that Dr. Reddy acted reasonably to restore Jeanette's airway. Dr. Graham, by way of a video evidence deposition, testified that Dr. Reddy failed to restore the airway in a timely manner. Dr. Graham also reiterated his opinion that Jeanette's injury was caused by a blood clot in the trach tube.

¶ 26    Mercy opted not to call its life-care planner Cathlin Vinett-Mitchell. It informed plaintiff of its decision on November 29, 2015, over 10 days into trial. Plaintiff had hoped to elicit information from Vinett-Mitchell's original report that Jeanette's brain injury was caused by a blood clot in her trach tube. However, because Vinett-Mitchell was outside the jurisdiction, plaintiff could not subpoena her after learning that Mercy did not intend to call her.

¶ 27    Finding that plaintiff was prejudiced by Mercy's decision, the trial court allowed plaintiff to read the portion of Vinett-Mitchell's draft report regarding causation to the jury, but also permitted Mercy to explain that Vinett-Mitchell would testify that the reason she omitted this conclusion from her final report was because she did not form an independent opinion regarding the cause of Jeanette's injury but gathered it from the medical records. The court prohibited plaintiff from arguing to the jury that it could draw a negative inference from Mercy's failure to call Vinett-Mitchell but allowed plaintiff to mention that she had not been called as a witness. In closing, plaintiff stated that Vinett-Mitchell "writes a report after reviewing the file and says this was related to a blood clot lodged in the trach, and after that report, lo and behold, nurse Vinett is not called to testify by the defense in this case."

¶ 28    On November 30, two days prior to closing, plaintiff's counsel informed the court that Jeanette fell and sustained an injury requiring brain surgery. She was not expected to regain competency, and plaintiff was making arrangements to have a guardian appointed. The jury was not told of this fact. On the evening of December 3, following closing arguments and after the case had been submitted to the jury, Jeanette passed away. The next morning, her death was spread of record, and Joi Jefferson, Jeanette's daughter, was appointed as the administrator of her estate. At that point, Mercy moved "again" for a mistrial "in light of Ms. Jeanette Turner's passing," which the trial court denied. A short time later, the jury then returned its verdict in favor of plaintiff in the amount of $22,185,598.90. Of this amount, $15,007,965.68 was allocated toward future damages.

¶ 29    Mercy filed a posttrial motion seeking, among other things, a vacatur of the future damages award. The trial court denied the motion on July 13, 2016, and that same day, plaintiff sought leave to file a fifth amended complaint adding a wrongful death claim against Mercy. The trial court allowed the motion but stayed the proceedings pending the outcome of this appeal.

¶ 30                                                   ANALYSIS

¶ 31    Mercy challenges both liability and damages on appeal. Turning first to liability, Mercy appeals the trial court's decision denying judgment *n.o.v.* on the basis that plaintiff failed to prove that Mercy's negligent conduct proximately caused Jeanette's respiratory arrest. A motion for judgment *n.o.v.* should be granted only when all of the evidence viewed in the light most favorable to the opponent so overwhelmingly favors the movant that a contrary verdict could not stand. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (citing *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). This is an exacting standard that is limited to " 'extreme situations.' " (Internal quotation marks omitted.) *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 548 (2005) (quoting *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1125 (2000)). This court may not substitute its judgment for that of the jury as to credibility of witnesses and weight of evidence. *Grillo v. Yeager Construction*, 387 Ill. App. 3d 577, 589 (2008). Nor may we enter a judgment *n.o.v.* "if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). A trial court's decision on a motion for judgment *n.o.v.* is subject to *de novo* review. See *Snelson v. Kamm*, 204 Ill. 2d 1, 42 (2003).

¶ 32    In a medical malpractice action, the plaintiff must provide evidence of the applicable standard of care, a negligent failure to comply with that standard, and an injury proximately caused by the failure to comply with the standard of care. *Somers v. Quinn*, 373 Ill. App. 3d 87, 90 (2007). The element of proximate cause must be established by expert testimony, and the causal connection may not be "contingent, speculative, or merely possible." *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 413 (2000). Instead, the expert testimony must be to a reasonable degree of medical certainty. *Simmons v. Garces*, 198 Ill. 2d 541, 556 (2002).

¶ 33    For the purpose of this argument, Mercy assumes that a blood clot in her trach tube caused Jeanette's arrest but argues that there was no evidence to a reasonable degree of medical certainty that the negligence of its doctors or nurses proximately caused her injury. Specifically, Mercy contends that plaintiff failed to present expert testimony establishing that earlier intervention by its doctors and nurses would have prevented Jeanette's arrest. We disagree.

¶ 34    There was evidence to indicate that Jeanette was bleeding from the trach site and that the blood from the trach site entered the tracheostomy tube due to the fact that the cuff was deflated. This blood then clotted and obstructed Jeanette's airway, leading to her arrest. Dr. Graham opined that if nurses Rohrwasser and David had alerted a doctor to the continued bleeding earlier, or if Dr. Cundiff had followed up on his treatment plan, he could have acted to staunch the continuing bleeding at the stoma through packing and cauterization: the same course of action he took in the cath lab. This, in turn, would have prevented the formation of the clot and ensured Jeanette's airway remained clear.

¶ 35    Because Dr. Graham testified to the specific interventions that, if undertaken earlier, would have prevented Jeanette's injury, this case is not comparable to those where experts failed to identify the treatment that should have been performed to prevent the plaintiffs' injuries. See, *e.g.*, *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967, 974 (1997) (where plaintiff failed to show that an earlier CT scan would have led to specific treatment that would have averted the decedent's death; judgment *n.o.v.* was appropriate); *Townsend*, 318 Ill. App. 3d at 414-15 (reversing denial of judgment *n.o.v.* where plaintiff failed to specify intervention that would have occurred with earlier diagnosis).

¶ 36    In short, Mercy's argument rests on a false premise—that there was no testimony regarding how earlier intervention would have prevented Jeanette's arrest. Given our finding to the contrary, we agree with the trial court that Mercy was not entitled to judgment *n.o.v.*

¶ 37    Mercy argues, in the alternative, that a new trial should have been granted due to the "causation gap," and errors in the admission of certain evidence. A motion for a new trial should be granted only where the jury's verdict is contrary to the manifest weight of the evidence. *Balough v. Northeast Illinois Regional Commuter R.R. Corp.*, 409 Ill. App. 3d 750, 774 (2011). A verdict is contrary to the manifest weight of the evidence where the opposite conclusion is clearly evident or where the jury's findings are unreasonable, arbitrary, and not based upon any of the evidence. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999) (citing *Maple*, 151 Ill. 2d at 454). We review a circuit court's decision with respect to a motion for a new trial for an abuse of discretion. *Id.* at 132-33.

¶ 38    We have already determined that plaintiff's case did not suffer from a "causation gap," and therefore, the evidence on causation necessarily meets the less exacting standard to withstand a motion for a new trial. The jury's finding that Mercy's negligence proximately caused Jeanette's injury was far from unreasonable. To the contrary, it was supported by the significant evidence that bleeding from the stoma led to a clot in Jeanette's trach tube and by the expert testimony that earlier intervention by Mercy's doctors would have stopped the bleeding and ensured the patency of Jeanette's airway.

¶ 39    Mercy also challenges several evidentiary rulings and argues that they support a new trial. A trial court's decisions on the admissibility of evidence are entitled to deference and will not be disturbed absent an abuse of discretion. *Werner v. Nebal*, 377 Ill. App. 3d 447, 454 (2007). Erroneous evidentiary rulings are only a basis for reversal if the error was "substantially prejudicial and affected the outcome of trial." (Internal quotation marks omitted.) *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 192. We will not reverse if it is apparent that "no harm has been done." *Jackson v. Pellerano*, 210 Ill. App. 3d 464, 471 (1991). Importantly, "[w]hen erroneously admitted evidence is cumulative and does not otherwise prejudice the objecting party, error in its admission is harmless." *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1013 (2005).

¶ 40    First, Mercy argues that the trial court erroneously allowed Dr. Dorothy Cooke, plaintiff's nurse expert, to testify to the cause of Jeanette's injuries. In response to this argument, plaintiff begins by disputing that Dr. Cooke testified to causation in the first place. But the record belies this reading. Dr. Cooke explicitly testified, "[M]y opinion is that the clot or a clot obstructed the tracheotomy tube such that Miss Turner eventually went into respiratory arrest." Plaintiff's counsel then asked Dr. Cooke's opinion "as to whether the conduct of the nurses that fell below the standard of care caused or contributed to cause the lodging of a clot or clots in the trach tube," to which Dr. Cooke responded that "[i]t's tragically logical that [Jeanette's] report

of clots, the development of bleeding and then the clotting of the blood and [Jeanette] saying 'These clots are choking me,' and then she went into respiratory arrest, to me there's no other explanation."

¶ 41    Mercy correctly notes that the court in *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 21 (1999), held that a nursing expert "could not testify regarding proximate cause since she was not a medical expert." While plaintiff argues that *Seef* was wrongly decided in light of our supreme court's holding that nursing is a medical specialty (*Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 113-14 (2004)), we need not resolve this issue, as any error in admitting Dr. Cooke's testimony was harmless. Drs. Graham, Vern, and Hirsh all opined that Jeanette's arrest was caused by a clot occluding the trach tube. Dr. Cooke's testimony, whether admitted erroneously or not, was cumulative of this evidence and could not have affected the outcome of trial. See *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 537 (2007) (erroneous admission of report regarding causation was harmless in light of other competent causation evidence).

¶ 42    Mercy next challenges on hearsay grounds the admission of three statements that a clot obstructed the trach tube. First, Mercy argues that Annette's testimony that a nurse told her a doctor found a clot was "double hearsay" and should have been barred. Annette described the nurse (who she had seen care for Jeanette) as a "tall black woman" with an Afro, wearing scrubs. The nurse told her "they found a clot." "They" was later identified as "the doctor who put in the trach." Second, Mercy argues that the court should not have allowed plaintiff to read an excerpt of Vinett-Mitchell's report indicating that Jeanette "had apparently developed a blood clot inside her tracheostomy tube which resulted in an anoxic brain injury due to hypoxia." Finally, Mercy challenges the admission of nurse Findrick's testimony that she "heard" the reason Jeanette was transferred to the ICU was that she had "thrown a clot."

¶ 43    With regard to Annette's testimony, we disagree with Mercy's contention that it constituted hearsay. First, the nurse's statement to Annette was admissible as an admission by Mercy's agent. See Ill. R. Evid. 801(d)(2)(D) (eff. Oct. 15, 2015) (a statement is not hearsay if it "is offered against a party and is *** a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship"); see also *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 88. And the nurse, contrary to Mercy's characterization, did not testify that a doctor *told* her he found a clot. Rather, Annette testified "She [(the nurse)] said the doctor who put the trach in found a blood clot in the trach." Because the nurse came from Jeanette's room, the information she conveyed could have been what she observed as opposed to what she was told.

¶ 44    In any event, Annette's testimony, as well as Vinett-Mitchell's report and nurse Findrink's testimony about the clot were cumulative to the properly admitted evidence that five doctors had charted a clot. Mercy attempts to minimize the impact of these notes by arguing that these doctors had no direct knowledge of the events of February 28 and March 1, but its own doctors and experts admitted that doctors are not entitled to "make up" chart entries. Moreover, the notes are not duplicative of each other, which one would expect if each doctor was merely repeating previously charted entries. And more significantly, the notes were not the only properly admitted evidence of clots: Dr. Noriega and nurse David's chart entries reflected that Jeanette was coughing out blood clots and Jeanette herself complained that the clots were choking her. Indeed, even Dr. Cundiff's note read that Jeanette's airway was occluded. Although Dr. Cundiff testified at trial that he did not use the word occluded to mean blocked

but, rather, that the trach tube was dislodged, the jury was not required to accept this testimony. In light of this significant, properly admitted evidence of a clot, the alleged hearsay testimony was cumulative and any error in its admission, harmless.

¶ 45 Mercy's final evidentiary challenge is to the admission of Dr. Graham's testimony in rebuttal that Dr. Reddy failed to restore Jeanette's airway in a timely manner. According to Mercy, Dr. Lavertu did not testify to Dr. Reddy's conduct during the code or opine on whether that conduct complied with the standard of care. Instead, Mercy argued, Dr. Lavertu merely said it was fortunate Dr. Reddy was present. Thus, plaintiff should not have been allowed to elicit testimony criticizing Dr. Reddy's conduct in rebuttal.

¶ 46 But as plaintiff points out, the allegation that Dr. Reddy mismanaged the code was only one out of five allegations of negligence presented to the jury. Given that the jury returned a general verdict in favor of plaintiff, we cannot determine what allegation of negligence it accepted. Pursuant to the "two-issue rule," we must presume that the jury's verdict rested on one of the other four charges of negligence not affected by the alleged error.[1] See *Robinson v. Boffa*, 402 Ill. App. 3d 401, 406-07 (2010); see also *Foley v. Fletcher*, 361 Ill. App. 3d 39, 50 (2005) ("defendant cannot expect recourse where a plaintiff presents more than one theory of her case, the defendant does not request special interrogatories and the jury returns a general verdict"). Because the admission of Dr. Graham's rebuttal testimony could only have prejudiced Mercy with respect to the charge that Dr. Reddy mismanaged the code, the two-issue rule does not permit us to disturb the jury's verdict. See *Arient v. Alhaj-Hussein*, 2017 IL App (1st) 162369, ¶ 45.

¶ 47 Having found no error in the court's denial of Mercy's motion for judgment *n.o.v.* or a new trial, we next consider Mercy's arguments with regard to damages. Mercy initially argues that plaintiff was not entitled to future damages where Jeanette, the injured party, died before the jury reached its verdict. This presents a pure question of law, which we review *de novo*. *Goldfine v. Barack, Ferrazzano, Kirschbaum & Perlman*, 2014 IL 116362, ¶ 20.

¶ 48 At the outset, we reject plaintiff's contention that Mercy forfeited its objection to the award of future damages. Plaintiff criticizes Mercy for making only a "perfunctory" motion for a mistrial upon learning of Jeanette's death and argues that this is insufficient to "preserve error." But Mercy does not argue that the court erred in taking the jury's verdict; rather, Mercy argues that the jury's award for future damages should be vacated. This challenge could only be raised in a posttrial motion after the jury rendered its verdict, which Mercy timely filed. Thus, plaintiff's argument regarding forfeiture is meritless.

¶ 49 Turning to the merits of the claim, according to Mercy, when Jefferson was appointed special administrator of Jeanette's estate pursuant to section 2-1008(b) of the Code of Civil Procedure (735 ILCS 5/2-1008(b) (West 2014)), the case became a survival action, and limited the relief that the jury could award. The Survival Act (755 ILCS 5/27-6 (West 2014)) abrogates the common law and allows a cause of action for malpractice, among other things, to survive a party's death. See *Howe v. Clark Equipment Co.*, 104 Ill. App. 3d 45, 47 (1982). "In a typical

---

[1]We do not necessarily agree that the admission of the rebuttal testimony was erroneous. It is arguable that Dr. Graham's rebuttal was properly admitted given Dr. Lavertu's testimony praising Dr. Reddy's participation in the code. See *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 50 (rebuttal evidence admissible where it "explains, repels, contradicts or disproves the evidence presented" in defendant's case-in-chief).

Survival Act claim, the representatives of the decedent would have a cause of action for medical expenses and pain and suffering of the decedent *up to the date of death*." (Emphasis added.) *Rodgers v. Cook County, Illinois*, 2013 IL App (1st) 123460, ¶ 29.

¶ 50        Plaintiff does not dispute that post-death damages are not available under the Survival Act but argues that, because the case had been submitted to the jury when Jeanette died, it did not become a survival action. Rather, she argues that Jeanette was "entitled to a decision" given that the case was "in the hands of the fact finder." In other words, plaintiff seeks a bright-line rule that once a case is submitted to a fact finder, no "post-submission events" should alter the judgment.

¶ 51        In light of the dearth of any Illinois authority on point, plaintiff cites *West v. United States*, No. 3:07CV581TSL-JCS, 2009 WL 2169852 (S.D. Miss. July 20, 2009), in support of her argument. *West*, in turn, relies on *Mitchell v. Overman*, 103 U.S. 62 (1880). In *West*, the plaintiff in a medical negligence case died after the case had been submitted to the court but before ruling. The court entered its judgment (awarding both past and future damages) *nunc pro tunc* to the date the case was submitted to it on the basis that the delay in ruling was not the fault of the plaintiff, but was for the court's convenience. *West*, 2009 WL 2169852, at *6. As support for its decision, the court cited *Mitchell*, another case where the plaintiff died before judgment was entered in his favor. *Id.* at *5. In *Mitchell*, the Supreme Court explained:

"[T]he rule established *** is, that where the delay in rendering a judgment or a decree arises from the act of the court, that is, where the delay has been caused either for its convenience, or by the multiplicity or press of business, either the intricacy of the questions involved, or of any other cause not attributable to the laches of the parties, the judgment of the decree may be entered retrospectively, as of a time when it should or might have been entered up. *** A *nunc pro tunc* order should be granted or refused, as justice may require in view of the circumstances of the particular case." *Mitchell*, 103 U.S. at 64-65.

¶ 52        But both *West* and *Mitchell* involved bench trials, whereas this case was tried before a jury. This is not a distinction without a difference. In a bench trial, a case is ripe for judgment when it is submitted to the judge, while in a trial by jury, a case is not ripe for judgment until a verdict is rendered. See *Brandon v. Caisse*, 145 Ill. App. 3d 1070, 1072 (1986) (citing *Tunnell v. Edwardsville Intelligencer, Inc.*, 43 Ill. 2d 239, 242 (1969)). This difference limits the ability of a court to enter a judgment *nunc pro tunc*. A *nunc pro tunc* order is "entry now for something that was done on a previous date and is made to make the record speak now for what was actually done then." *Pestka v. Town of Fort Sheridan Co.*, 371 Ill. App. 3d 286, 295 (2007). Because there was no judgment that actually could have been entered on December 3, given that the jury was still deliberating, the court could not enter judgment *nunc pro tunc* to that date. The earliest date the judgment could have been entered was December 4, the day after Jeanette died. For this reason, we agree with Mercy that this case became a survival action upon Jeanette's death. And as a survival action, plaintiff is not entitled to damages that accrued after Jeanette's death. See *Rodgers*, 2013 IL App (1st) 123460, ¶ 29.

¶ 53        Contrary to plaintiff's argument, application of this bright-line rule—taking into account an event occurring after a case is submitted to a fact-finder but before it is ripe for judgment—is not categorically prejudicial to plaintiffs. For example, if Jeanette had died even one minute after the jury returned a verdict, Mercy would have been liable for the full amount of future damages.

¶ 54    Our decision finds support in the principle that the purpose of tort damages is to make plaintiff whole rather than to bestow a windfall. See *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 406 (1997); *Wilson v. The Hoffman Group, Inc.*, 131 Ill. 2d 308, 321 (1989). In other words, compensatory tort damages are intended to compensate plaintiffs, not to punish defendants. *Wills v. Foster*, 229 Ill. 2d 393, 401 (2008) (citing *Peterson v. Lou Bachrodt Chevrolet Co.*, 76 Ill. 2d 353, 363 (1979)). We would run afoul of this principle if we allowed Jeanette's estate to collect an award for future injuries Jeanette will no longer suffer. For this reason, we limit plaintiff's recovery to compensation for injuries Jeanette suffered prior to her death.

¶ 55    In a related argument, Mercy also challenges the $2.5 million in damages awarded due to disfigurement on the basis that the award included "a significant sum" for Jeanette's disfigurement over her future life expectancy. But at trial, the court sustained Mercy's objection to plaintiff's tendered instruction with separate lines for past and future disfigurement. This leaves us with no way to know what portion of the $2.5 million award, if any, was attributable to future disfigurement.

¶ 56    It is well settled that a party waives his right to complain of an error which he induced the court to make. *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000). Mercy asks us to overlook its waiver because it could not have known, at the time of the instructions conference, that Jeanette would die before the verdict was announced. But that is of no import. Mercy accepted plaintiff's separation between past and future damages for other damage elements, such as loss of normal life and pain and suffering. For whatever reason, Mercy did not wish to have the jury separate past and future damages on the element of disfigurement and it cannot now argue an inconsistent position on appeal. See *id.* (citing *Auton v. Logan Landfill, Inc.*, 105 Ill. 2d 537, 543 (1984)). Certainly, Mercy's insistence that the jury award on this element of damages be rendered in a single sum cannot serve as a basis for a new trial. And because we have no way to know whether any portion of the award for disfigurement went toward future damages, Mercy is likewise not entitled to a remittitur on this ground.

¶ 57    Mercy also challenges the $1 million award for Jeanette's past emotional distress as duplicative of the $500,000 award for past pain and suffering and $2 million award for past loss of a normal life. We previously rejected the argument that emotional distress and pain and suffering damages were duplicative of each other in *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 20. There, the jury awarded the plaintiff $200,000 for pain and suffering and $130,000 for emotional distress. *Id.* ¶ 10. This court rejected the defendant's claim that this constituted a double recovery and presumed that the jury understood and followed the court's instructions. *Id.* ¶ 20. The evidence that the jury did not bestow a double recovery on plaintiff is even stronger here, where the damages for emotional distress were greater than those for pain and suffering. See *Marxmiller v. Champaign-Urbana Mass Transit District*, 2017 IL App (4th) 160741, ¶ 56 (where jury awarded plaintiff $1.5 million for emotional distress and $1 million for pain and suffering, court reasoned that jury excluded emotional distress from suffering). Thus, Mercy is not entitled to a remittitur on this basis.

¶ 58    To the extent that Mercy argues that a plaintiff cannot claim emotional distress for bodily injuries (as it is included in a claim for pain and suffering and loss of normal life), *Babikian* rejected this premise and held that damages for emotional distress are available to prevailing plaintiffs in cases involving personal torts such as medical negligence. *Babikian*, 2011 IL App

(1st) 102579, ¶ 19 (citing *Clark v. Children's Memorial Hospital*, No. 108656, slip op. at 28 (Ill. May 6, 2011)).[2]

¶ 59   Finally, we address Mercy's argument that the large amount of future damages claimed for pain and suffering, emotional distress, and loss of normal life "tainted" both the jury's decision on liability as well as the jury's award for past damages in those areas. Plaintiff rightly characterizes this argument as a *non sequitur*. We fail to see how a claim for future damages—no matter how sizable—could influence a jury's verdict on liability or its award for past damages. In the absence of evidence of such influence in the record, we reject this argument.

¶ 60                                   CONCLUSION

¶ 61   For the reasons set forth above, we affirm the award in favor of plaintiff for $7,177,632.82, representing the award for past damages, but vacate the award for future damages in the amount of $15,007,965.68.

¶ 62   Affirmed in part and vacated in part.

---

[2]In the modified opinion on denial of rehearing, *Clark* removed medical negligence as an example of a personal tort where emotional distress damages were available. *Clark v. Children's Memorial Hospital*, 2011 IL 108656, ¶ 111. We decline Mercy's invitation to read this removal to mean that emotional distress damages are not available in medical malpractice cases.