2021 IL App (1st) 200956-U

FIFTH DIVISION
December 17, 2021

Nos. 1-20-0956, 1-20-0964 (cons.)

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| GARY LAGESSE, as Independent Administrator of the Estate of Harold L. Lagesse, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee/Cross-Appellant, | ) ) ) | |
| v. | ) ) | No. 18 L 2422 |
| FRANCISCAN ALLIANCE, INC., d/b/a Franciscan St. James Health-Chicago Heights, | ) ) ) | |
| Defendant-Appellant, | ) ) ) | |
| (SAVIO GEORGE MANATT, M.D., and BOULEVARD MEDICAL ASSOCIATES, S.C., Defendants-Appellees/Cross-Appellants). | ) ) ) ) | Honorable John P. Callahan, Jr., Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Cunningham and Connors concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The circuit court correctly denied the hospital's motions for directed verdict and judgment notwithstanding the verdict (judgment *n.o.v.*).  Various alleged trial errors do not warrant a new trial.  The circuit court properly denied remittitur.  Plaintiff's conditional cross-appeal, and the defendant physician's separate conditional cross-appeal are dismissed as moot.  Affirmed.

¶ 2    Harold L. Lagesse died as a result of injuries following a fall while he was a patient at a hospital operated by defendant Franciscan Alliance, Inc., d/b/a Franciscan St. James Health-Chicago Heights (Franciscan). His son, plaintiff Gary Lagesse, as independent administrator of his estate, sued, alleging wrongful death and survival negligence claims against Franciscan and co-defendants Savio George Manatt, M.D., and Dr. Manatt's employer, Boulevard Medical Associates, S.C. (Boulevard). Following a trial, the jury found in favor of Manatt and Boulevard, but against Franciscan, on liability, and awarded $1.6 million in damages against Franciscan.

¶ 3    Before us are a direct appeal by Franciscan, and conditional cross-appeals by plaintiff and Dr. Manatt. On direct appeal, Franciscan contends that (1) the circuit court erroneously denied its motions for directed verdict and judgment notwithstanding the verdict (judgment *n.o.v.*); (2) in the alternative, various trial errors warrant a new trial; and (3) also in the alternative, a remittitur is warranted. In his conditional cross-appeal, plaintiff contends that, if this court "rules in favor of [Franciscan] and overturns the jury verdict," we must also vacate the jury verdict in favor of Manatt and either (1) enter a judgment *n.o.v.* against him or (2) grant a new trial against Franciscan and Manatt. In response to plaintiff's conditional cross-appeal, Dr. Manatt has filed his own conditional cross-appeal, contending that, should we hold that plaintiff's conditional cross-appeal is meritorious, we should then reverse the court's denial of Dr. Manatt's motion for directed verdict. We affirm the judgment of the circuit court and dismiss the cross-appeals as moot.

¶ 4                                  BACKGROUND

¶ 5    On December 26, 2012, 84-year-old Harold Lagesse was admitted to Franciscan complaining of shortness of breath and unstable angina. In the early morning hours of December 28, Harold fell. By 11 p.m. that evening, Harold had died. On March 7, 2018, plaintiff filed his complaint alleging wrongful death and survival actions against, among others, Franciscan and Dr.

Manatt. The following facts are taken from the allegations in plaintiff's complaint, as well as the evidence adduced at trial.

¶ 6    Dr. Manatt, Harold's attending physician, evaluated Harold and diagnosed him with a bilateral pulmonary embolism, which required anticoagulation therapy. Harold was prescribed Ambien (a sleep aid), Senokot (a laxative), and various blood thinners. Dr. Manatt further ordered that Harold have "bathroom privileges with help" based upon his conclusion that Harold was at risk of falling.

¶ 7    In the early morning hours of December 28, Harold fell in the bathroom of his hospital room. A "rapid response team" was called at around 2:15 a.m. Harold suffered bruising on his nose and face, fractured facial bones, and facial lacerations requiring sutures. A physician on the rapid response team ordered a CT scan following suturing and an x-ray. The scan was performed at 4:15 a.m., and the results were reported about ten minutes later. The results indicated, among other things, "[b]ilateral internal carotid artery calcifications," a "[r]ight frontal subcutaneous hematoma," and "[m]ild mucosal thickening of the visualized paranasal sinuses." Dr. Manatt was notified of Harold's fall shortly before 4 a.m., and following the CT scan, he unsuccessfully sought a consultation from an ENT (ear, nose, and throat) physician specialist. At around 8 a.m., Dr. Manatt requested an x-ray of Harold's lumbar spine and asked that Franciscan's medical director be informed that there was "no ENT on staff."

¶ 8    At around 10:30 a.m., Harold complained to nursing staff of nausea and to his family of abdominal pain. At 1 p.m., Harold again complained of abdominal pain to one of Franciscan's nurses, who forwarded those complaints to Dr. Manatt. Dr. Manatt examined Harold and ordered an abdominal CT scan. At 3 p.m., a nurse noted that Harold was in "sinus tachycardia with a BBB

pattern." Half an hour later, a cardiologist examined Harold, noted Harold's "belly pain of unknown etiology," and was concerned about undiagnosed bleeding.

¶ 9 At 4:20 p.m., the CT scan of Harold's abdomen was performed, which indicated "extensive regional abnormality of the right hepatic lobe" and blood in the peritoneal cavity that was "consistent with hepatic laceration." The diagnosis was a large "hematoma of the right hepatic lobe of the liver." Dr. Manatt was made aware of these findings.

¶ 10 A surgical resident attended to Harold at around 5 p.m., ordered "one liter bolus IV" and one unit of blood with two additional units, noting Harold was "to be transferred to Rush [Hospital]." A consulting surgeon concurred with the resident's assessment at around 7 p.m. Shortly thereafter, another physician ordered a blood transfusion and IV (intravenous) fluids, but Dr. Manatt discontinued that order at around 7:50 p.m. Harold was eventually transferred to Rush at 8:10 p.m.

¶ 11 Before trial, plaintiff filed his answers to interrogatories pursuant to Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018). Among his answers, plaintiff stated that Joan Spitrey, R.N., would testify as an expert witness to a "reasonable degree of nursing certainty" regarding (1) duties owed to Harold while he was a patient at Franciscan, (2) "applicable standards of care for the nurses working in the telemetry unit" at Franciscan, and (3) other relevant standards of care and "best practices and recognized custom and practice" with respect to falls in a hospital.

¶ 12 Nurse Spitrey noted that "[a]dditional interventions, including but not limited to non-skid socks, a yellow arm band, fall risk door magnets, and a bed alarm" were not documented as having been part of Harold's care plan. Plaintiff's answer also disclosed the following:

> "3. Nurse Spitrey will testify that the standard of care
>
> required the nurses to draft an appropriate Nursing Plan of Care for

4

Falls. * * * As previously stated, [Harold] should have been identified as being at risk for falls at the time of his admission. Regardless of whether he was at a high risk for falls or a low risk of falls, the risk for falls and injury were real and should have been documented. It is incorrect to conclude that because someone is at a low risk for falls the standard of care does not require a care plan specific to fall prevention.

4. Nurse Spitrey will testify that Nurse Fulton's failure to appreciate the significance of the medication list and incorporate [Harold's] medication list into the fall assessment was a deviation from the standard of care. A reasonably well qualified nurse must understand and recognize the expected therapeutic effects of a patient's mediation list in order to properly evaluate a patient's risk for falling. Nurse Spitrey will testify to a reasonable degree of certainty that Nurse Fulton lacked the appropriate training to be able to identify those medications that put [Harold] at an increased risk of falling on December 26, 2012[,] and December 27, 2012. Specifically, Nurse Spitrey will testify that the administration of the Zolpidem (Ambien), the anticoagulants[,] and the diuretics all increased [Harold's] risk for fall and serious injury. As a consequence of Nurse Fulton's ignorance or willful disregard for the medication list, she failed to incorporate the expected therapeutic effects of said medications into her fall assessment. This lack of

knowledge and understanding was exacerbated on the night of December 27, 2012[,] when the Zolpidem (Ambien) dose was doubled to 10 mg and still no attempt was made to reassess or re[-]evaluate [Harold's] risk for falling. Not only was the assessment at 9:00 p.m. performed incorrectly, Nurse Fulton failed to re[-]evaluate and reassess [Harold] after doubling the Zolpidem dose to 10 mg. Nurse Spitrey's opinion is based not only on her own education, training, custom and practice, it is also based on the testimony of [Franciscan's] own nurse, Charito Maribbay.

*** [A]s a direct result of the aforementioned deviations from the standard of care, [Franciscan], by and through its nurses failed to utilize and implement necessary and reasonable interventions to reduce [Harold's] risk for fall and injury. Nurse Spitrey will testify that the 2012 policies and procedures that were produced in the course of this litigation and identified as being in place at [Franciscan] represent the standard of care. However, Nurse Spitrey will testify that [Franciscan] failed to meet the standard of care because the nurses failed [to] utilize the interventions that were called for under the fall policies. In particular, the nurses failed to provide and require [Harold] to wear non-skid socks at all times. The nurses failed to provide [Harold] with a yellow arm band identifying him as a fall risk. The nurses also failed to apply the yellow magnetic signs to [Harold's] hospital

6

room door in order to identify him as a fall risk. Each of these failures, individually and taken as a whole, increased [Harold's] risk for falls and injury."

¶ 13     On November 15, 2019, the circuit court held a hearing on Franciscan's 27 motions *in limine*. In its motion *in limine* number 11, Franciscan argued in part that whether Harold had been assigned either a "low" or "moderate" fall risk, "the interventions are essentially the same, and they include nonskid socks, ***." Franciscan added that there was no testimony that "the negligence on the fall score caused or contributed to the fall." Franciscan further noted that there was no evidence that certain interventions, including providing him with nonskid socks, were not put in place. The court, however, rejected Franciscan's arguments, stating that it would allow the jury to hear the parties' expert witnesses and "weed through everything."

¶ 14     In its motion *in limine* number 21, Franciscan argued that plaintiff should be barred from referring to bed alarms because the standard of care does not require them. Plaintiff responded that not "each and every intervention constitutes a standard of care"; instead, "it goes to using the interventions, using judgment to reduce the risk of physical harm. So in order to keep the patient safe they need to use the interventions that are available to them." The following colloquy then took place:

> "THE COURT:  All right.  Let me ask a question, your Nurse Spitrey [plaintiff's expert witness] will not be testifying now that it is a violation[,] or it is a deviation of the standard of care, will she?
>
> MR. GRAHAM [plaintiff's attorney]:  I mean she said I believe that it was prudent for this patient.
>
> THE COURT:  Prudent is not standard of care.

So[,] I'm going to tell you that because you could cross her unless she's going to start flipping there will be no testimony from her that it's a violation of the standard of care. She can say reasonable and prudent, but you'll be able to cross her and if for some reason now she says it is a violation of the standard of care we're going to have a problem just so you know that that's my position on it. Okay?

MR. GRAHAM: We'll instruct her.

MR. M. McCALLISTER [plaintiff's attorney]: Yeah.

THE COURT: There we go.

The circuit court then stated, "So that one is denied."

¶ 15 At trial, Todd Lagesse testified that he was Harold's son and that, at around 7:30 a.m. on December 28, 2012, his sister Susan called him and told her that their father had fallen in the early morning hours at the hospital. Todd went to the hospital at approximately 9 a.m. and saw that his father was bruised on his face, with one eye nearly swollen shut and stitches above one of his eyes. In addition, Harold's nose was swollen with packing in it, so Harold had difficulty breathing through his nose. According to Todd, his father was taken for x-rays at around 9:30, and upon returning to his hospital room, his father complained of stomach pain to the nurse and Dr. Manatt.

¶ 16 Todd noted that, eventually his brothers David and Gary arrived, but Susan stayed at their parents' house to care for their mother, who had suffered "a major stroke" in 1991 and required "pretty much 24-hour care." Todd added that his father had been the primary caretaker of his mother and did most of the caretaking alone. Todd described Harold as the "patriarch of the family," whom everyone could look up to and always ask for advice. In response to counsel's

8

question, Todd said, "My kids absolutely adored grandpa." Finally, Todd noted that Harold had received a Purple Heart for service during the Korean war after having been shot twice in the leg.

¶ 17 Gary Lagesse testified that his father "did everything around the house," including laundry, dishes, lawn mowing, cleaning, and cooking. Gary said that, after Susan told him that their father had fallen, Gary arrived at the hospital at around 11 a.m. Gary recalled his father complaining of abdominal pain at around 2 or 2:30 p.m. on December 28. Gary stated that the day of Harold's death was the "[w]orst day of my life" and he thought about it every day since, "over 2,000 days."

¶ 18 Joan Spitrey, a registered nurse, testified on behalf of plaintiff as an expert witness in the field of nursing care. In connection with this cause, Spitrey stated that she reviewed the medical records, depositions, and Franciscan's policies. Spitrey recalled that Harold's admission orders included one directing that Harold "would be assisted to the bathroom," which Spitrey stated "makes pretty clear that *** [Harold] needed assistance at all times to the bathroom." Spitrey observed, however, that there was only one documented instance of the nurses having assisted Harold to the bathroom each day from December 26-27.

¶ 19 Spitrey stated that Franciscan erred in failing to add 20 points to Harold's fall risk score based upon the presence of a "hep-lock" (heparin lock). Spitrey noted that Franciscan's policy itself requires the additional points regardless of whether the hep-lock is attached to "tubes." Spitrey further stated that the nurses erred in failing to consider as an additional risk factor the fact that Harold was taking a sleep aid (Ambien), an anticoagulant, and a laxative (Senokot), all of which would combine to make him more likely to be confused, bruise easily, and get out of bed more frequently. Spitrey explained that Franciscan's policy and the standard of care both required a nurse to consider the effects of the patient's medications, even for patients who are not a fall risk. Spitrey stated that nonskid socks "certainly could" prevent falls, as well.

¶ 20     Spitrey opined that, "to a reasonable degree of nursing certainty," Franciscan's nurses did not accurately assess Harold's fall risk and failed to "implement the appropriate interventions" to help prevent Harold's fall.  Spitrey was also opined that, within a reasonable degree of nursing certainty, "[the standard of care was] not met" based upon the fact that the only documented interventions in the incident report following Harold's fall were (1) Harold's bed was in the "low position with the brakes on" and (2) a call light and telephone were within reach.

¶ 21     On cross-examination, Spitrey agreed that Fulton noted "protocol followed" in the nursing notes following Fulton's assessment of Harold at around 9 p.m. on December 26.  Counsel for Franciscan then asked whether "protocol followed" means "all those things [in] the fall protocol were followed such as remove clutter from the room, nonskid socks, call light in reach, bed in low position, things of that nature."  Spitrey responded as follows:

> "I don't know what it means.· And I don't think she knew
>
> what it meant.· She couldn't clearly state what she knew for a fact
>
> was in place at the time.
>
> ***
>
> And there is no evidence in the record of what was in place
>
> at the time outside of the incident report which doesn't list the socks
>
> as you mentioned."

Spitrey, however, acknowledged that there are "situations" in which a nurse may do something, such as asking a patient if he would like a glass of water, that is not noted in the patient's chart.

¶ 22     Welton Fulton testified that she was working as a staff nurse at Franciscan on December 28, 2012, and that Harold was one of the patients to whom she attended.  Fulton agreed that, every

time she helps a patient to and from the bathroom, she notes it in the patient's medical chart. In Harold's chart, there were only two instances of his being taken to the bathroom.

¶ 23    Fulton evaluated Harold for a "fall risk" score on the evening of December 27th, which resulted in a score of 15, a "low risk" for falls. She did not add 20 points to Harold's fall risk score because his hep-lock was not attached to an IV apparatus. She conceded, however, that Franciscan's policy requires an additional 20 points for a patient's fall risk score for a hep-lock and that she failed to meet the standard of care when she did not include these points in Harold's score. A score of 35 would have equated to a "moderate" risk, which would have included additional interventions.

¶ 24    Fulton stated that, although the incident report indicated that the only fall risk interventions Harold received were a "low bed, a call light, and a phone," Harold had "more things in place," and Fulton was "pretty sure" that Harold was wearing nonskid socks. Fulton agreed, however, that she could not point to anywhere else that would show that he had received additional interventions. Fulton also conceded that the incident report did not show that a bed alarm had been in place, but that if it had been, she would have noted it in the report. Fulton agreed that laxatives may have an impact on the "frequency and urgency" to go to the bathroom, but she stated that Harold was taking a "stool softener [and] not a laxative.[1]" Fulton conceded that the incident report identified the cause of the fall as having been "related to toileting." Fulton also admitted that a "reasonably careful nurse" would have considered Harold's prescription for Ambien with respect to his fall risk, but that she failed to do that.

---

[1] But see generally, Senokot, *available at* https://senokot.com/ (last visited Nov. 10, 2021) (describing its product as a "laxative"); Prescribers' Desk Reference, *available at* https://www.pdr.net/drug-summary/Senokot-sennosides-3182.84 (last visited Nov. 12, 2021) (describing the product as an "[a]nthraquinone stimulant laxative").

¶ 25    Dr. Manatt testified that he directed that Harold was to have "bathroom privileges with help," *i.e.*, that the nurses were to help Harold to and from the bathroom.  Dr. Manatt further agreed that age, arthritis, pulmonary embolism, being in an unfamiliar place, and "[a]ll medications, including the blood thinners" were factors to be considered in determining an individual's fall risk. Dr. Manatt agreed that Harold had all five of the factors, and added, "There will be more."

¶ 26    Dr. Morris Papernik testified as an expert in the field of medicine on behalf of plaintiff. Dr. Papernik stated that Harold was a fall risk base upon one of Dr. Manatt's first orders indicating that Harold had bathroom privileges with assistance, "meaning that [Harold] shouldn't go to the bathroom by himself and the nurse has to accompany him."  Dr. Papernik further opined "to a reasonable degree of [medical] certainty] that, if Harold had been admitted to Franciscan but had not fallen, he would have been discharged safely.  In particular, Dr. Papernik stated that the medical records indicated an anticipated discharge date of December 28.

¶ 27    Susan Burdick testified that she was Harold's daughter and that, after her mother had a stroke, her father not only took care of his wife entirely, but also did all of the work around the house.  Susan stated that, when Susan's husband informed her mother that Harold had died, her mother was devastated, and said "[W]hat's going to happen to me?"  Susan said that, initially, she and her brothers cared for their mother—which Susan characterized as a 24-hour job"—for about three months before hiring someone to help.

¶ 28    Following Susan's testimony, plaintiff then asked the court to "read in the life table."  The following exchanges then occurred:

> "MR. McCALLISTER [Plaintiff's attorney]:  So this is a
> stipulated document from the National Vital Statistics Report.  In
> 2012, the life expectancy for a white male ages 84 was 6.8 years.

THE COURT: Stipulated. Defense[?]

MS. REITER [counsel for Franciscan]: Stipulated, yes."

The circuit court noted the stipulation between the parties, and plaintiff then rested his case.

¶ 29    Dr. Mahon then testified as an expert on behalf of Dr. Manatt. Dr. Mahon agreed that a contributing cause to Harold's death was the lacerated liver.

¶ 30    Dr. Michael Grendon testified as an expert witness on behalf of Dr. Manatt. Dr. Grendon stated that, Dr. Manatt "did adhere to the standard of care" with respect to Harold. When Dr. Manatt's counsel asked Dr. Grendon whether Harold's fall was preventable, Dr. Grendon replied, "Well, it could have been prevented if [Harold] had rung the call bell. But I don't think, other than that, it would have been prevented." On cross-examination, Dr. Grendon was asked whether Harold "bled from his liver from the time of the fall, up to the time of his death." Although Dr. Grendon answered, "Well, you don't really know the exact timing," he admitted that, during his deposition, he stated that Harold's liver laceration "probably did" bleed from the time of the fall until the time of death.

¶ 31    MariJo Letizia testified on behalf of Franciscan as an expert witness in the field of nursing. Letizia stated that, in her opinion, Fulton fully complied with the standard of care. Letizia explained that, in Harold's medical record, the notation "protocol followed" conclusively established that Fulton provided all necessary interventions based upon Harold's particular fall risk assessment. Letizia stated that, it's "certainly not required" for a nurse to delineate which intervention(s) were put in place for a patient. Letizia agreed that Harold's medical record did not indicate that he was provided with a "fall bracelet," but she added "there's no testimony that says that there wasn't either [sic]." Letizia agreed that stool softeners and laxatives "assist patients in having bowel movements," but she disagreed that "sedative-hypnotics affect a patient's level of

13

consciousness." Letizia conceded that she did not count how many times in the record Harold was assisted in going to the bathroom, but she added the following: "I'll just finish my statement by saying that there's no requirement under the standard of care for nursing or nursing staff to chart every time a patient is assisted with [*sic*] going to the bathroom."

¶ 32     In response to a question from the jury, Letizia testified that, regarding whether a hospital uses the Morse scale or some other assessment tool, "the nurse is required, in accordance with the standard of care, to be very cognizant of the medications that patients are being administered and to think about the ramifications of those medications.  That is absolutely required in accordance with standard of care and nursing education and nursing practice."

¶ 33     Following closing arguments, the circuit court instructed the jury in part as follows:

> "The plaintiff claims that he was injured and sustained damage and that [Franciscan was] negligent in one or more of the following respects:
>
> ***
>
> a.  Failed to identify Harold *** as being at an increased risk for falls;
>
> b.  Failed to perform accurate fall assessments;
>
> c.  Failed to consider effects of the medications Harold *** received;
>
> d.   Failed to implement reasonable safety interventions to reduce [Harold's] risk for fall;
>
> e.  Failed to follow the physician order to provide assistance to and from the bathroom.

\* \* \*

"An opening statement is what the attorney expects the evidence will be. The closing argument is given at the conclusion of the case and is a summary of what an attorney contends the evidence has shown. If any statement or argument of any attorney is not supported by the law or the evidence, you should disregard that statement or argument.

\* \* \*

If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate the children of the decedent for the pecuniary loss proved by the evidence to have resulted to the children of the decedent. Pecuniary loss may include loss of money, benefits, goods, services[,] and society.

\*\*\*

In determining pecuniary loss, you may consider what the evidence shows concerning the following:

One, what instruction and moral training the decedent might reasonably have been expected to give had he lived;

Two, his age;

Three, his sex;

Four, his health;

Five, the grief, sorrow, and mental suffering of the children;

15

Six, the relationship between the children and decedent.

When I use the term 'society' in these instructions, I mean the mutual benefits that each family member receives from the other's continued existence including love, affection, care, attention, companionship, comfort, guidance, and protection.

According to the table of mortality in evidence, the life expectancy of a person aged 84 years is 6.8 years. This figure is not conclusive. It is the average life expectancy of persons who have reached the age of 84. It may be considered by you in connection with other evidence relating to the probable life expectancy of the plaintiff in this case including evidence of his occupation, health, habits[,] and other activities, bearing in mind that some persons live longer and persons less than average."

The court then provided the jury with "Verdict Form A," which had a blank line for total damages as well as blank lines for itemized damages comprising "Pain and suffering experienced"; "Loss of society"; and "Grief, sorrow, mental suffering of the children."

¶ 34    Following deliberations, the jury found in favor of Dr. Manatt and Boulevard and against plaintiff. The jury, however, found in favor of plaintiff and against Franciscan and calculated total damages of $1.6 million, consisting of $1 million for pain and suffering experienced; $300,000 for loss of society; and $300,000 for grief, sorrow, and mental suffering of Harold's children. The circuit court subsequently denied Franciscan's post-trial motion. This appeal follows.

16

¶ 35                                                ANALYSIS

¶ 36                          *Motions for Directed Verdict and Judgment n.o.v.*

¶ 37    Franciscan first contends that the circuit court erred in denying its motion for directed verdict and its post-trial motion seeking judgment *n.o.v.* Specifically, Franciscan argues that, since "[n]one of plaintiffs' [*sic*] witnesses" testified that Franciscan's nurses deviated from the standard of care or otherwise contributed to Harold's injury and death, plaintiff failed to establish proximate cause, and therefore the court should have either granted Franciscan's motions.

¶ 38    A judgment *n.o.v.* is only warranted "in those limited cases" where all of the evidence adduced at trial, " 'when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). A trial court weighs neither the evidence nor the credibility of the witnesses, and it may not grant a judgment *n.o.v.* even if the verdict is against the manifest weight of the evidence. *Id.* Notably, only if the plaintiff has failed to establish a *prima facie* case, *i.e.*, failed to present at least "some evidence" on every essential element to the cause of action, is the defendant entitled to judgment as a matter of law. *Kokinis v. Kotrich*, 81 Ill. 2d 151, 154-55 (1980). The identical rules apply with respect to motions for directed verdict at the close of all the evidence. *Maple*, 151 Ill. 2d at 453 n.1. Our standard of review on both issues is *de novo*. *Lawlor v. North American Corporation of Illinois*, 2012 IL 112530, ¶ 37.

¶ 39    "To sustain an action for medical negligence, plaintiff must show: (1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care." *Neade v. Portes*, 193 Ill. 2d 433, 443-44 (2000) (citing *Purtill*

17

*v. Hess*, 111 Ill. 2d 229, 241-42 (1986)). Here, Franciscan contends that plaintiff failed to establish proximate cause. Proximate cause has two elements: cause in fact and legal cause. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). An act or omission is said to be a cause in fact of the event if it was a material element and a substantial factor in bringing the event about. *Id.* Legal cause concerns foreseeability, *i.e.*, whether the injury is one that a reasonable person would see as a likely result of the allegedly tortious conduct. *Id.* at 456. In essence, proximate cause exists when the plaintiff's injury is the natural and probable result of the defendant's negligent act or omission. *N.W. v. Amalgamated Trust & Savings Bank*, 196 Ill. App. 3d 1066, 1076-77 (1990). Notably, there can be more than one proximate cause contributing to any one injury. *D.C. v. S.A.*, 178 Ill. 2d 551, 564 (1997). Where reasonable minds could differ, the issue of proximate cause is a question of fact for the jury to decide. *Lee*, 152 Ill. 2d at 455.

¶ 40    In this case, the circuit court did not err in denying Franciscan's motions. Viewing the evidence in the light most favorable to the nonmoving party (here, plaintiff), as we must (see *Maple*, 151 Ill. 2d at 453), there was at least "some evidence" to support proximate cause (*Kokinis*, 81 Ill. 2d at 154-55). The record here reveals that Dr. Manatt's order specifically required that Harold be given bathroom privileges "with assistance." According to the medical records, however, Harold was assisted to the bathroom twice over a two-day period. The jury could have reasonably inferred that Harold used the bathroom unaccompanied on other occasions.

¶ 41    Fulton testified that, although the hospital policy requires that a patient's fall risk score increase by 20 points if the patient has a hep-lock, Harold's score did not reflect the increase despite the fact that he also had a hep-lock. Fulton agreed that Harold's score would have been "moderate" rather than "low." This higher risk category would then have entitled him to additional

fall risk preventions, including a bed alarm that would have immediately alerted the nursing staff whenever Harold got out of bed unassisted.

¶ 42    In addition to a laxative, Harold was also prescribed a blood thinner and Ambien (a sleeping aid). Letizia testified that a nurse is required, in accordance with the standard of care, to be "very cognizant of the medications that patients are being administered and to think about the ramifications of those medications." Spitrey testified Franciscan's nurses failed to consider as an additional fall risk factor the fact that Harold was taking a sleep aid (Ambien), an anticoagulant, and a laxative (Senokot), all of which would combine to make him more likely to be confused, bruise easily, and get out of bed more frequently. Spitrey further observed that Franciscan's policy also required nurses to consider the medications a patient was taking, regardless of the patient's actual fall risk. Fulton, however, admitted that she did not take Harold's use of Ambien into account when determining his fall risk, despite the standard of care requiring that.

¶ 43    Although Harold had a call button at his disposal, the jury could have reasonably inferred that Harold could not wait for a nurse to assist him to the bathroom due to the fact that he was taking a laxative, which prior testimony established increases the urgency of the need to go to the bathroom. Other interventions, such as a bed alarm or nonskid socks, would have either immediately alerted nurses to Harold leaving his bed or provided Harold with greater traction and stability in walking unassisted. The jury could further have reasonably inferred that the absence of these additional interventions proximately caused Harold's fall, *i.e.*, the fall was a "natural and probable result of the defendant's negligent act or omission." *N.W.*, 196 Ill. App. 3d at 1076-77; see also *Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, ¶¶ 35-36 (affirming the circuit court's denial of the defendant hospital's motion for judgment *n.o.v.* where the plaintiff's expert "testified to the specific interventions that, if undertaken earlier, would have

19

prevented [the decedent's] injury"). Finally, Dr. Papernik testified that, but for Harold's fall, the medical records indicated that Harold was anticipated to have been discharged on December 28. As noted above, even if a verdict is against the manifest weight of the evidence, a court may not grant a motion for directed verdict or judgment *n.o.v. Maple*, 151 Ill. 2d at 453, 453 n.1. Viewing these facts in the light most favorable to plaintiff, however, we cannot hold that the evidence so overwhelmingly favors Franciscan that no contrary verdict based on that evidence could ever stand. *Id.* at 453. Therefore, there was sufficient evidence to support proximate cause, and the circuit court did not err in denying Franciscan's motion for directed verdict and motion for judgment *n.o.v.*

¶ 44    We find Franciscan's reliance upon *Timm v. Indian Springs Recreation Ass'n*, 226 Ill. App. 3d 760 (1992), and *Smith v. Chicago Limousine Service, Inc.*, 109 Ill. App. 3d 755 (1982) to be unavailing.  In *Timm*, the court noted that plaintiff's expert "explained that the ANSI [American National Standards Institute] requires handrails as a safety device on all carts, but then admitted that of all the golf courses where he had worked, he had never employed these standards. In fact, he had no knowledge of these standards prior to trial." *Id.* at 765. Neither of these facts are present here. In *Smith*, the defendant's employee, a limousine driver, offered to help the plaintiff, but the plaintiff refused his offer of assistance. *Smith*, 109 Ill. App. 3d at 759-60. Here, there is no evidence that Harold refused any of the interventions Franciscan should have offered to him. *Timm* and *Smith* are therefore unavailing.

¶ 45                    *Various Alleged Trial Errors*

¶ 46    Franciscan next contends in the alternative that, should we reject its contention that the circuit court erred in denying Franciscan a directed verdict or judgment *n.o.v.*, it is nonetheless entitled to a new trial because of multiple trial errors, namely, (1) plaintiff's purported violation of

Illinois Supreme Court Rule 213, (2) plaintiff arguing matters outside the evidence, and (3) improper jury instructions.[2]   Franciscan adds that these errors, both individually and cumulatively, justify a new trial.

¶ 47    Franciscan first argues that the circuit court erred in denying certain of its motions *in limine* and that plaintiff "[violated] the spirit" of the court's rulings and the "requirements of Rule 213." Franciscan argues that plaintiff's "systematic misconduct" denied Franciscan a fair trial.  We will not reverse a circuit court's order on a motion *in limine* absent an abuse of discretion.  *Swick v. Liautaud*, 169 Ill. 2d 504, 521 (1996).  A court abuses its discretion only where its ruling is "arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view." *TruServ Corp. v. Ernst & Young, LLP*, 376 Ill. App. 3d 218, 227 (2007).

¶ 48    Franciscan has asserted the circuit court erred in deciding various motions *in limine* but has failed to provide those motions in the record on appeal.  It is a fundamental rule that the appellant (here, Franciscan) has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error.  *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).  In the absence of such a record on appeal, we must presume that the circuit court's order had a sufficient legal and factual basis.  *Id.* at 392.  Furthermore, we must resolve any doubts that arise from the incompleteness of the record against the appellant.  *Id.*  On this basis alone, we can presume that the court properly denied the motions *in limine* and thus reject Franciscan's claim of error. Nonetheless, forfeiture aside, Franciscan's claims fail on the merits.

---

[2]    Franciscan has also included "plaintiff's failure to prove proximate cause" as an argument on this issue.  Franciscan, however, has failed to develop this argument, resulting in its forfeiture.  See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).  Furthermore, we have already resolved this precise issue *supra*.  We thus disregard it.

¶ 49     In this case, Spitrey's opinion indicated that interventions such as a bed alarm and nonskid socks were not documented as having been a part of Harold's care plan.  Spitrey then concluded that Franciscan's nurses failed to meet the standard of care in part because they "failed [to] utilize the interventions that were called for under the fall policies."  The purpose of Rule 213(f) is to "prevent unfair surprise at trial."  Ill. S. Ct. R. 213, Committee Comments (adopted Mar. 28, 2002). Spitrey's proffered opinion noted the absence of a bed alarm as an intervention and warned Franciscan that her opinion would be that its nurses violated the standard of care by failing to utilize appropriate interventions.  No reasonable argument can be made that Spitrey's testimony at trial that a bed alarm was one of the necessary interventions that Franciscan's nurses failed to use resulted in an unfair surprise to Franciscan.  Franciscan's claim thus fails.

¶ 50     Franciscan also argues that, since (1) there was "uncontroverted evidence" that Franciscan provided nonskid socks to "every patient" and (2) there was no evidence that the lack of the socks caused or contributed to the fall, the circuit court therefore erroneously denied its motion *in limine* seeking to bar reference to the absence of nonskid socks.  At the outset, the evidence was not "uncontroverted":  Fulton herself could only say she was "pretty much sure" that Harold was wearing nonskid socks at the time of his fall.  Furthermore, Fulton conceded that there was nothing in the medical record or the incident report to corroborate her subjective belief.  The jury could have thus reasonably inferred that the absence of the socks was a contributing factor in Harold's fatal fall.  In any event, as with the claim regarding a bed alarm, this matter was specifically referred to in Spitrey's Rule 213(f) disclosure, and therefore Franciscan suffered no unfair surprise at trial.  Consequently, we reject this claim of error on this additional ground.

¶ 51     Franciscan complains that plaintiff "harped on a nursing 'plan of care' repeatedly" and that plaintiff allegedly violated an agreed order barring physician opinion testimony regarding the

22

nursing standard of care. As Franciscan notes, however, the circuit court *sustained* Franciscan's objections on both of these matters, which cured any possible error. See *Simmons v. Garces*, 198 Ill. 2d 541, 567 (2002) (citing *Diaz v. Kelley*, 275 Ill. App. 3d 1058, 1066 (1995) ("Because the trial court sustained plaintiff's objection to this comment, any potential error was cured.")). Franciscan cites nothing to contradict this rule. Its claim is thus meritless.

¶ 52    Similarly, although Franciscan complains of plaintiff raising "questions about laxatives" that was not contained within the Rule 213 disclosures of Spitrey, Franciscan further acknowledges that the circuit court sustained codefendant Manatt's objections to these questions, again curing any possible error. See *id.* Additionally, the record reveals that Spitrey's opinion would state that Fulton's failure to appreciate the significance of Harold's medications and incorporate them into her fall assessment, which deviated from the standard of care. "A witness may elaborate on a disclosed opinion as long as the testimony states logical corollaries to the opinion, rather than new reasons for it." *Foley v. Fletcher*, 361 Ill. App. 3d 39, 47 (2005). "The testimony at trial must be encompassed by the original opinion." *Id.* Here, Spitrey's testimony regarding the effect of Senokot on Harold's fall risk is squarely encompassed by her original opinion that referred more broadly to his medications. This claim is thus meritless on this additional ground.

¶ 53    With respect to the purported error in admitting the life table into evidence, Franciscan asserts that it objected to the life table. As plaintiff points out, however, Franciscan *stipulated* at trial to the admission and subsequent publication to the jury of the life table. Plaintiff argues that Franciscan has forfeited this claim, citing *Foster v. Englewood Hospital Ass'n*, 19 Ill. App. 3d 1055 (1974), and Franciscan offers nothing in reply. We agree with plaintiff that *Foster* controls this issue, and Franciscan has forfeited this issue. See *id.* at 1072-73.

¶ 54    Franciscan next claims that, during his opening statements [*sic*] and at trial, plaintiff "repeatedly ignored the trial court's orders on motion *in limine*, referred to matters that never came into evidence[,] and asserted theories which were unsupported by expert testimony," resulting in the denial of a fair trial for Franciscan.  Franciscan, however, then proceeds to offer bullet-point partial statements with utterly no legal analysis or cogent legal argument.  This is inadequate under Supreme Court Rule 341.  See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on.  * * *  Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").  Franciscan has forfeited this point of error, and we therefore will not consider it.

¶ 55    Franciscan next contention is that the circuit court erred in instructing the jury as to the following issues:  the failure to (1) identify Harold as being at an increased risk for falls (instruction subparagraph (a)), (2) perform accurate fall assessments (subparagraph (b)), (3) consider the effects of Harold's medications (subparagraph (c)), and (4) follow Dr. Manatt's order to assist Harold to and from the bathroom (subparagraph (e)).  Franciscan further contends that the court erred in including an award for grief as a separate line on the verdict form, arguing that grief is merely "duplicative" of the loss of society damages line, which was also on the form.

¶ 56    "A litigant has the right to have the jury clearly and fairly instructed upon each theory which was supported by the evidence." *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995).  Although it is error to give an instruction not based on the evidence, even mere "slight" evidence may support a proffered instruction. *Id.*  Moreover, "a reviewing court may not reweigh it or determine if it should lead to a particular conclusion." *Id.*  The question of what issues have been raised by the evidence is within the discretion of the trial court. *Id.*  As noted

above, a court abuses its discretion occurs only when its ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *TruServ Corp.*, 376 Ill. App. 3d at 227.

¶ 57 In this case, the circuit court did not err in instructing the jury. There was at least "slight" evidence supporting these instructions. There was abundant testimony that Harold was at an increased risk for falls, based upon his age (84), health (shortness of breath, unstable angina, and pulmonary embolism), and medications (Ambien, a sleep aid; Senokot, a laxative; and various blood thinners). These facts justified the instruction in subparagraph (a) (identifying Harold as being at an increased risk for falls).

¶ 58 In addition, there was evidence that Franciscan's nurse failed to accurately determine Harold's fall risk (subparagraph (b)). Franciscan's nurse herself admitted that she did not add 20 points to Harold's fall risk score because his hep-lock was not attached to an IV apparatus. She further conceded that Franciscan's policy requires an additional 20 points for a patient's fall risk score and that she failed to meet the standard of care when she did not include these points in Harold's score. The evidence at trial indicated that a score of 35 would have resulted in a "moderate" fall risk score, which then would have justified additional interventions. This evidence supported the instruction in this subparagraph.

¶ 59 As to the instruction in subparagraph (c), Franciscan's failure to consider the effects of Harold's medications, there was again at least "slight" evidence to support this instruction. The testimony established that Harold was taking Ambien (which can cause increased sleepiness and confusion), Senokot (which increases the urgency and frequency of bowel movements), and blood thinners (which increase the injuries following a fall). Despite these medications, the only documented fall prevention interventions provided to Harold were a bed in the low and locked

position, a phone, and a call button. This evidence, combined with the lack of additional interventions such as a bed alarm and nonskid socks, supported the instruction that Franciscan failed to consider[3] Harold's medications when determining which interventions to provide him.

¶ 60 Franciscan's final argument, regarding the instruction in subparagraph (e), that Franciscan failed to follow Dr. Manatt's order to provide Harold with assistance to and from the bathroom, is also unavailing. Fulton agreed that, every time she helps a patient to and from the bathroom, she notes it in the patient's medical chart. In Harold's chart, however, there were only two instances of his being taken to the bathroom. Again, merely "slight" evidence supports a proffered instruction, and it is inappropriate for this court to reweigh the evidence or determine if it should lead to a specific result. *Leonardi*, 168 Ill. 2d at 100. As such, this evidence was sufficient to support this particular instruction, and we must reject Franciscan's argument on this point.

¶ 61 In sum, since the circuit court's decision was not arbitrary, fanciful, unreasonable, or one that no reasonable person would take, the court did not abuse its discretion in instructing the jury. *TruServ Corp.*, 376 Ill. App. 3d at 227. Franciscan's claim therefore fails.

¶ 62 With respect to the verdict form, plaintiff cites to multiple decisions holding that grief is not only compensable, but also distinct from a loss of society award. "The supreme court has rejected recovery for mental anguish or bereavement as an element of loss of society." *Hunt v. Chettri*, 158 Ill. App. 3d 76, 79 (1987) (citing *Bullard v. Barnes*, 102 Ill. 2d 505, 514-15 (1984); *Elliott v. Willis*, 92 Ill. 2d 530, 539 (1982)). Franciscan makes no argument in its reply that we

---

[3] Although Franciscan criticizes—in a one sentence argument—the term "consider" in the instruction, we note that pattern jury instructions are replete with that term. See, *e.g.*, Illinois Pattern Jury Instructions, Criminal, Nos. 1.01, 1.02, 2.04, 3.12, 3.13, *et al.* (4th ed. 2000); Illinois Pattern Jury Instructions, Civil, Nos. 1.01, 1.05, 2.02, 2.03, 2.04, 3.03, 3.05, 3.07, 3.08, *et al.* (4th ed. 2000).

should distinguish or otherwise set aside the reasoning of established precedent. We therefore reject Franciscan's claim of error.

¶ 63    Finally, since we have rejected each of Franciscan's alternative contentions individually and the trial as a whole was fair, Franciscan's claim of cumulative error necessarily fails. See *McDonnell v. McPartlin*, 192 Ill. 2d 505, 536 (2000). Franciscan's claim of error is thus meritless.

¶ 64                                              *Remittitur*

¶ 65    In further alternative, Franciscan contends that, should this court deny its other grounds for appeal, we should enter a remittitur to reduce the verdict from $1.6 million to $400,000. Franciscan argues that the jury award of $1 million for pain and suffering was excessive and shocks the judicial conscience. Franciscan asserts that the testimony in this case did not establish that Harold suffered substantial pain, and while at Rush, he was described as being in severe pain for less than an hour before his death. Franciscan concludes that this award should be reduced to $200,000. Franciscan further argues that the awards of $300,000 each for loss of society and the children's mental suffering were excessive, because Harold was "an 84-year-old man with severe cardiomyopathy and blood clots in his lung who passed away within 21 hours of his fall." Franciscan asks that these awards be reduced to a total of $200,000.

¶ 66    "The amount of a damage award is peculiarly an issue of fact for the jury to determine." *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 470 (1992). Moreover, a jury's award in a wrongful death action may not be overturned unless it is "obviously outside the limits of fair and reasonable compensation" (*id.*), "obviously the result of passion or prejudice" (*id.*), or so large that it shocks the judicial conscience (*Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 67). In addition, the jury award will not be subject to remittitur where it falls within "the flexible range of conclusions which can reasonably be supported by the facts." *Lee*, 152 Ill.

2d at 470. If the jury was properly instructed and had a reasonable basis for its award, a reviewing court will not disturb its verdict. *Id.*

¶ 67 Although there is no mathematical formula for deciding whether a jury award is fair and reasonable, some factors to consider include the extent of the injuries suffered and the permanency of the plaintiff's condition, the plaintiff's age, the possibility of future deterioration, the extent of the plaintiff's medical expenses, and the restrictions imposed on the plaintiff by the injuries. *Klingelhoets*, 2013 IL App (1st) 112412, ¶ 67. We review the circuit court's decision to grant a remittitur for an abuse of discretion. *Miyagi v. Dean Transportation, Inc.*, 2019 IL App (1st) 172933, ¶ 20. As noted above, we will only find an abuse of discretion occurs when the circuit court's ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *TruServ Corp.*, 376 Ill. App. 3d at 227.

¶ 68 In this case, there was no abuse of discretion. The injuries suffered, the permanency of Harold's condition, and the "restrictions imposed on [Harold] by the injuries" were extreme: Harold's injuries resulted in his death. These factors far outweigh Harold's age at the time of his injuries. In particular, Harold was severely bruised about his face, with one eye nearly swollen shut and stitches above one of his eyes, and his nose was swollen and had packing in it. Harold also had suffered a lacerated liver, which was the source of his abdominal pain and which he had complained about beginning at around 9:30 a.m., 16 hours before his death.

¶ 69 Moreover, testimony at trial firmly established that Harold's death caused great pain to his surviving family members. Harold was the primary caretaker of his wife—who had suffered a major stroke nearly 20 years prior—and alone did most of the caretaking, which was described as 24-hour care. Gary, Harold's son, said that Harold did "everything" around the house, including laundry, dishes, lawn mowing, cleaning, and cooking. Susan said that, initially after their father's

death, she and her brothers cared for their mother, but after a mere three months they had to hire someone to help with their mother's care. Harold was also described as the "patriarch of the family," whom everyone could look up to and always ask for advice. Todd, Harold's son, said that his children "absolutely adored grandpa." Gary stated that the day his father died was the worst day of his life and that he had thought about it everyday, and emphasized the span of time at trial: "over 2,000 days." Harold's daughter, Susan, recalled that her mother was devastated when she learned that Harold had died and asked, "[W]hat's going to happen to me?" On these facts, the jury's award was neither obviously outside the limits of fair and reasonable compensation (*Lee*, 152 Ill. 2d at 470), nor obviously the result of passion or prejudice (*id.*), nor so large that it shocks the judicial conscience (*Klingelhoets*, 2013 IL App (1st) 112412, ¶ 67), so we may not overturn it. The circuit court's denial of Franciscan's motion for remittitur was therefore not an abuse of discretion because its decision was not "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *TruServ Corp.*, 376 Ill. App. 3d at 227. Franciscan's final contention of error is therefore unavailing.

¶ 70                    *The Conditional Cross-Appeals*

¶ 71    As noted above, plaintiff has filed a conditional cross-appeal, contending that, should this court grant relief in favor of Franciscan and overturn the jury verdict, we must also vacate the verdict in favor of Manatt and either (1) enter judgment *n.o.v.* against him or (2) grant plaintiff a new trial against Franciscan and Manatt. In turn, Dr. Manatt has filed his own conditional cross-appeal, contending that, should we grant plaintiff relief and order either judgment *n.o.v.* or a new trial against him, we must reverse the circuit court's denial of Dr. Manatt's motion for directed verdict. Neither condition, however, is present: we have not granted relief in favor of Franciscan,

nor have we granted the relief plaintiff seeks in his conditional cross-appeal. Therefore, we dismiss the cross-appeals as moot.

¶ 72                                CONCLUSION

¶ 73    We affirm the judgment of the circuit court and dismiss the cross-appeals as moot.

¶ 74    Affirmed; cross-appeals dismissed.